JOHN E. HUGHES et al., Partners Doing Business Under Name of Eastern Theater, Appellants, v. KANSAS CITY MOTION PICTURE MACHINE OPERATORS, LOCAL NO. 170, et al.

In Banc, April 30, 1920.

1. **PICKETING: Employment of Union Laborer: Proprietor's Right to Operate Machine: Injunction.** The right of the owner of a picture theater to operate the machine used to throw pictures on a screen and thereby to keep down the expense of the business, is the simple and primitive right of a man to earn a livelihood with his own hands; and picketing by a labor union of his theater because he refused to hire a union operator to operate the machine, and thereby to coerce him, by reducing his income, into observing the rule of the union that no proprietor of a moving-picture show should operate his own projecting machine, is arbitrary and unlawful; and where the purpose is to reduce the proprietor's income to such an extent as to ruin the business or compel him to observe the rule, and is accomplished by a patrol of pickets in front of the theater, to repeat untrue statements to its patrons and passers-by that the proprietor is nfair to organized labor, and to request them not to tronize the theater, stirring in them uneasiness, amounting in some cases to intimidation, which reduces the attendance, the unlawful act should be restrained by injunction.

*Held,* by GRAVES, J., concurring, with whom GOODE, WOODSON and WILLIAMSON, JJ., concur, that the real issue in this case was whether a picture-show business should be run by its owner or by a local union of projecting-machine operators; that the question for decision is whether a man, whose business will not justify the employment of outside laborers and who is able to un his own business, is to be put out of business because he cannot or will not comply with the rule of a labor union which demands that he join the union and go to work for another, whilst the union puts in one of its members to operate his machinery and run his business; and, therefore, as the union attempted to enforce its unlawful rule

Lughes v. Motion Picture Machine Operators.

by resorting to such picketing as would result in the destruction of the business of the owner, it should be enjoined from from further picketing.

*Held*, by BLAIR, J., dissenting, with whom WALKER, C. J., and WILLIAMS, J., concur, that the evidence does not establish intimidation, nor were the statements that the proprietor was unfair to organized labor untrue, but the facts show that the pretended proprietor had no interests in the business, and his purpose in pretending that he had was to defeat the efforts of the labor union to increase and maintain their wages by preventing the deceptive practice of non-union operators evading the rule by claiming they were partners or had an interest in the business, and such being the facts the statement that he was unfair to union labor was true, and consequently the charge of unfairness was justified. *Held*, also, that 'peaceful picketing" has long been recognized in this State as lawful; and if the rule is to be changed and picketing declared, unlawful *per se*, it ought to be done by the Legislature.

2. ———: ———: ———: Peaceable: Free Speech: Illegal Conspiracy: Intimidation. Picketing by a labor union is not lawful as a matter of course, simply because it is not accompanied by threats, assaults or other methods of intimidation; in some instances picketing is lawful, but it is not lawful if accompanied by intimidation or is directed against a proprietor of a picture theater who is exercising his primitive right to operate his own projecting machine and is accompanied by misrepresentations regarding his attitude towards organized labor which results in irreparable injury to his business. In such case, even though it be peaceable, it is not to deprive the union of their privilege of free speech to enjoin it.

*Held*, by GRAVES, J., concurring, with whom GOODE, WOODSON and WILLIAMSON, JJ., concur, that the question of enjoining free speech is not properly in this case; but if it were, it is the law that, though an individual may write or speak what he pleases and only becomes liable for the falsity of his utterances, a number of individuals, who act in concert and in pursuance to a conspiracy to prevent another from carrying on a lawful business and to injure him by false statements, can be enjoined; for what may be a lawful act if done by an individual may become an illegal conspiracy if done by a number of persons acting in concert.

*Held*, by BLAIR, J., dissenting, with whom WALKER. C. J., and WILLIAMS, J., concur, that the facts of this case fail to establish intimidation, or any rational basis for an apprehen-

282 Mo.—20

Hughes v. Motion Picture Machine Operators.

sion of intimidation, of patrons of the theater or passers-by; but on the contrary the evidence shows that the picketing was peaceful, without interference with patrons or pedestrians, no effort at personal persuasion, no loud words, no threats, no violence, and with only the statement, called out to the public, that the theater was "unfair to union labor; please do not patronize it." *Held*, also, that even if the proof establish intimidation, the injunction should be limited to the unlawful acts of intimidation, and not in effect make all picketing unlawful.

3. ———: ———: ———: Injunction. Where picketing is unlawful and amounts to a private nuisance and an irreparable injury to plaintiffs, even though their business be small, it will be enjoined. *Held*, by BLAIR, J., dissenting, with whom WALKER, C. J., and WILLIAMS, J., concur, that the pretended owner of the theater in this case was not forced to unpleasant activity to preserve its patronage, the picketing was not unfair, the representation of his acts as unfair was true, and there is no basis for a holding that the picketing amounted to a nuisance or was unlawful.

4. INJUNCTION: Fifth Amendment. The Fifth Amendment of the U. S. Constitution, guaranteeing due process of law, is a restraint on Congressional action only.

5. ———: Constitutional Guarantees: Free Speech: Lawful Business: Nuisance. The clause of the Fourteenth Amendment of the U. S. Constitution which prohibits a state from depriving a person of liberty without due process of law, the kindred provisions in Sections 4 and 30 of Article 2 of the Missouri Constitution, and Section 14 of said Article 2 guaranteeing freedom of speech, do not guarantee absolute rights without limit or reference to the correlative rights of others. To follow a lawful business or vocation is part of the liberty protected by those constitutional provisions; but when the business is carried on at a place or in a manner to make it a nuisance and injurious to others, it is no longer within their protection, but becomes an illegal act. *Held*, by BLAIR, J., with whom WALKER, C. J., and WILLIAMS, J., concur, that a court cannot enjoin any person from giving information and expressing any grievances he may have against another, whether in the act of picketing or otherwise, without violating the express inhibitions concerning free speech contained in Section 14 of Article II of the Missouri Constitution.

Appeal from Jackson Circuit Court.—*Hon. T. J. Seehorn*, Judge.

REVERSED AND REMANDED (*with directions*).

*Charles M. Miller* for appellants.

(1) The trial court erred in holding that defendants' asserted constitutional right of free speech and personal liberty gave them the right to picket plaintiffs' business even in a "peaceful manner," and interfere with or destroy it, and that such did not violate plaintiffs' constitutional right to conduct and carry on their business without interference by defendants. Hardie-Tynes Mfg. Co. v. Cruse, 189 Ala. 66; Lohse Patent Door Co. v. Fuelle, 215 Mo. 458; Barr v. Essex Trades Council, 53 N. J. Eq. 101; Fitts v. Atlanta, 121 Ga. 567; Allgeyer v. Louisiana, 165 U. S. 578, 41 L. Ed. 835; Hopkins v. Oxley Stove Co., 83 Fed. 912; Local Union No. 313, Employees' Internat. Alliance v. Stathakis, 205 S. W. 450; Webb v. Cooks' Union, 205 S. W. 465; St. Germain and Wife v. Internatl. Union No. 9, 97 Wash. 282, 166 Pac. 662; Huntworth v. Tanner, 87 Wash. 684; Gompers v. Buck Stove & Range Co., 221 U. S. 418, 439; Hitchman Mine Case, 245 U. S. 256; Montgomery v. Railroad, 258 Fed. 382; Roraback v. Mo. Pic. Operators' Union, 140 Minn. 481, 168 N. W. 766, 169 N. W. 529. (2) The trial court erred in holding under the evidence that the picketing was done in a "peaceable manner" from which we understand the court means without coercion, intimidation, threats, force or violence. Ex parte Stout, 198 S. W. (Texas) 967; St. Germain v. Internatl. Union No. 9, 97 Wash. 282, 166 Pac. 664; 24 Cyc. 834; Local Union No. 313 Hotel & Restaurant Employees' Internatl. Alliance v. Strathakis, 205 S. W. 450; Webb v. Cooks', Waiters' & Waitresses' Union No. 748, 205 S. W. 465; Jones v. Van Winkle, 131 Ga. 336; Pierce v. Stablemen's Union, 156 Cal. 70, 103 Pac. 324; Beck v. Ry. Teamsters' Union, 118 Mich. 497; Otis Steel Co. v. Local Union, 110 Fed. 698; Lohse Patent Door Co. v. Fuelle, 215 Mo. 467; Goldberg v. Stablemen's

Union, 149 Cal. 432, 86 Pac. 806; 1 Eddy on Combinations, sec. 539.

*Walsh & Aylward* for respondents.

(1) The plaintiffs had a right to conduct their business without unlawful interference, but this right is qualified by the personal and natural right of the defendants to do any lawful act without molestation, regardless of any injury caused thereby, because these respective rights are at least equal to each other, the resulting damage incidental thereto, and the plaintiffs had no "vested right" to the lessened patronage, if any, produced thereby. The trial court did not err in holding, therefore, that the "picketing" of the plaintiffs' business was "peaceful," and to deny the defendants the right so to do in a "peaceable manner" would be to deprive them of their constitutional rights of "free speech" and "personal liberty." St. Louis v. Gloner, 210 Mo. 502; Clothing Co. v. Watson, 168 Mo. 145; Hamilton-Brown Shoe Co. v. Saxey, 131 Mo. 212; Ex parte Heffron, 179 Mo. App. 639; Berry Foundry Co. v. Moulders' Union, 177 Mo. App. 88; Root v. Anderson, 207 S. W. 257; Door Co. v. Fuelle, 215 Mo. 450; Mo. Const. secs. 4, 14 and 30, Art. 2; Foster v. Retail Clerks' Assn., 78 N. Y. Supp. 860; Bossert v. Dhuy, 221 N. Y. 732; National Protective Assn. v. Cummings, 170 N. Y. 315; Mills v. U. S. Printing Co., 99 App. Div. 605, 81 N. Y. Supp. 185; Wyckoff Amusement Co. v. Kaplan, 170 N. Y. Supp. 549; Butterick Pub. Co. v. Typ. Union, 100 N. Y. Supp. 438; Searle Mfg. Co. v. Terry, 106 N. Y. 438; Beaton v. Tarrant, 102 Ill. App. 124; Kemp v. Division No. 241, 255 Ill. 213; Iron Moulders' Union v. Allis Chalmers Co., 166 Fed. 45; Goldfield Mines Co. v. Goldfield M. U., 159 Fed. 501; Tri-City Council v. American Steel Foundries, 238 Fed. 732; Duplex Printing Co. v. Deering, 247 Fed. 198, 252 Fed. 722; Karges Furn. Co. v. Wood Workers' Local, 165 Ind. 421, 2 L. R. A. (N. S.) 788;

Minnesota Store Co. v. Cavanaugh, 131 Minn. 458; Mfg. Co. v. Hollis, 54 Minn. 223; Gray v. Council, 91 Minn. 171, 21 L. R. A. 337, 40 Am. St. 319; Empire Theater Co. v. Cloke, 163 Pac. 107; Lindsay v. Montana Fed. of Labor, 37 Mont. 264; Pinkerton v. Verberg, 78 Mich. 573; Beck v. Teamsters' Union, 118 Mich. 516; Carew v. Rutherford, 106 Mass. 1; Plant v. Woods, 176 Mass. 492; ˙Everett Waddey Co. v. Typ. Union, 105 Va. 188, 5 L. R. A. (N. S.) 795; Jones v. Van Winkle, G. & M. Works, 131 Ga. 336, 17 L. R. A. (N. S.) 848, 127 Am. St. 235; Daley v. Superior Court, 112 Cal. 94; Parkinson v. Council, 154 Cal. 581; Traux v. Bisbee Local, 171 Pac. 124; Maryland Lodge v. Adt, 100 Md. 252; Stoner v. Robert, 43 Wash. L. R. 437. (2) The question as to whether the "picketing" was, or was not, "peaceful," and thereby lawful, was a question of fact for the trial court, and it did not err in so finding that the "picketing," under the evidence, was "peaceful." Phillips v. Trust Co., 214 Mo. 684; Hummell v. Zinn, 184 S. W. 1157; Brecker v. Fillingham, 209 Mo. 583; Creamer v. Bibert, 214 Mo. 479; Tanker v. Kier, 195 Mo. 203; Hoffman v. Hoffman, 217 Mo. 191; Jones v. Thomas, 218 Mo. 540; Walker v. Wallis, 186 S. W. 1041.

GOODE, J.—These plaintiffs brought this action to obtain relief by injunction against the picketing of plaintiffs' place of business on the corner of Ninth and Lister streets in Kansas City, where a moving picture show was conducted under the name of the Eastern Theater. The defendant, Kansas City Motion Picture Machine Operators, Local 170, is a voluntary organization of picture machine operators in Kansas City, and is affiliated with a much larger union known as The International Alliance Theatrical Stage Employees. The other defendants are members of the Local Union No. 170. Plaintiff Hughes was a member of the local union from 1912 until September 1, 1915, when he ceased to be, because he was sentenced to pay a fine of

one hundred dollars, or in default of payment, to suspension from the local union for one year for having divulged secrets of the union, it was asserted by defendants, but denied by him. Hughes refused to pay the ·fine and the union put the fine and suspension together, as he said; meaning that he was suspended from membership and could only be reinstated by paying the fine. He then formed a contract, of a kind not clearly stated, for a picture theatre at Fifteenth and Spruce streets in said city. The Union objected to his working there, ·because it was against the rules of the union for a member to have an interest in a show and conduct it himself. Another fine of one hundred dollars, as we gather from the testimony, was imposed on him. It seems Hughes had conducted another theatre also at Thirty-ninth and Main streets, where a union operator of the machine used to throw the pictures on the screen, was discharged when Hughes became the owner of the place; Hughes said, because he would be required by the rules of the union to sign a contract with the operator for a year, which he could not afford to do; that if he would have "to quit the show, he would have to quit the union first."

Those disagreements are in no way related to the present controversy, except in their tendency to prove bad feeling existed between Hughes and the local union prior to January 3, 1916, when Hughes became a partner with the other plaintiff, Briner, in the Eastern Theater. Briner had in his employ at that time, to handle the projecting machine, a union operator named Shuttler. As Hughes was capable of operating the projector, Shuttler was given two weeks notice to quit. In the interim members of the local union called on Hughes and told him if he would enter the union again, his fine would be reduced to seventy-five dollars. Hughes asked if, in that event, he would be permitted to operate his machine, and was told by the members of the union they would not consent for him to do so under any circumstances; that he must employ a union oper-

ator and pay him the union scale. Hughes said the business would not justify paying the scale of wages, seventeen dollar a week, in addition to the city license fee and the war tax, and that he thought he had a right to operate his own machine. The agents of the union told him they would put their pickets out at his theatre and keep them there until he gave in to their proposition. Picketing was begun on April 16, 1916, being postponed until that time for some unexplained reason. On said day members of the executive board of the union went to the Eastern Theatre with an operator and also two pickets, and told Hughes he could take his choice; hire the operator, or be picketed. He asked time to consider the proposition; but the agents refused to grant it and put the pickets on duty that night.

The testimony goes to show plaintiff Hughes' wife was knocked down on the sidewalk by one of the pickets that evening, whereupon the pickets scattered, as did a crowd of persons who had collected about the front of the theatre; but this is the only evidence of the commission of an act of violence, although the picketing continued until the present action was begun, two months later, on June thirteenth. The pickets worked by walking up and down the sidewalk in front of the theater, addressing themselves to persons who passed and saying: "This place is not fair to organized labor; please do not patronize it;" and sometimes: "The picture machine in this theater is run by a non-union operator; please do not patronize it." The testimony for defendants is that the request was not addressed to individuals, but "to the public," and in a moderate tone; and it does not appear the voice or manner of the pickets was boisterous or threatening. The patrol of the sidewalk usually began about 7:45 o'clock in the evening, when the attendance was most numerous.

Plaintiff Hughes testified the agents of the union told him they would ruin him and break up his business; that they had spent five thousand dollars to make

another theatre hire a union operator and would spend that much on him. The union offered to find him a position as operator in some other theatre if he would hire a union man for his place; but he refused for the reason that his wife was incapable of looking after the business, as it seems she, instead of Briner, the other owner, was assisting to do, and the business would not bear the expense of a hired operator. Plaintiff had employed a union operator at a picture theatre on Ninth street and Troost avenue, which his wife conducted for a while.

One witness testified she had been in the habit of patronizing the Eastern Theatre, but on account of the controversy with the union, ceased to do so, as her husband said there was danger. Another witness testified that on a Sunday afternoon he became alarmed and took his boy out of the theatre on account of the way "they [the pickets and a gathering of persons] were acting." This witness said two pickets were walking in front of the place, and a crowd of fifteen or twenty persons were on the northeast corner; among them two men whom he had seen acting as pickets previously; that he thought there might be a fight or riot.

According to the witnesses for plaintiffs the receipts of their business fell off about fifteen dollars a week after the picketing began and in consequence of it.

Several witnesses for defendants said the demeanor of the pickets was quiet and peaceable; and though they (the witnesses) were in the habit of passing the place, they had seen no disturbance. By way of counteracting the influence of the pickets, the wife of Hughes would sometimes walk along with them, and would say to passersby: "This place is not unfair to organized labor;" and on one or two occasions she threw a bunch of tickets at the pickets. The testimony for defendants brought out clearly the real grievance the union cherished against plaintiffs, and the sole reason why they maintained pickets in front of their place of business. A man named Brown, who was not a member of the union,

stayed about the projecting machine in the theatre and the union agents thought he was operating it; but the evidence conclusively shows he was a student and paid Hughes for instructing him. The testimony shows there was a rigid rule of the union that no proprietor of a moving-picture show should operate his own projecting machine, and that in every case a member of the union must be employed. The reason assigned by defendants for this rule is, that experience had shown persons would claim to be interested as a partner in the business and to have the right to operate as such when, in fact, the claim was a subterfuge used as a means to obtain a position as operator without becoming a member of the union and at a wage less than the union scale; that if such a rule was not enforced, proprietors of theatres, even though members of the union themselves, would be able to employ non-union operators at a lower wage, under the guise of taking them in as partners. There was testimony, too, in behalf of defendants, about the proprietors of other theatres who employed union operators and otherwise complied with the rules of the union, having complained on occasions when some proprietor was permitted to handle his own machine. It should be stated there was evidence that the object of the union and its rules was to improve the condition of the members and of the laboring classes in general, by increasing wages and elevating the scale of living. Some of the individual defendants testified in denial of the charges that they had threatened to ruin the plaintiffs, put them out of business or cherished illwill against them.

The court below in its judgment found that each and all of the defendants had been engaged in picketing plaintiffs' place of business and persistently requested the public not to patronize it, on the theory that plaintiffs did not employ a union operator and, therefore, was unfair to union labor; that the picketing resulted in substantial damage to the business of plaintiffs; but was conducted in a peaceable manner and, therefore, was not

unlawful; that if defendants were enjoined from continuing their conduct they would be deprived of the rights of free speech and personal liberty guaranteed by Sections 4 and 30, Article II, of the State Constitution, and Amendments 1 and 14 to the National Constitution; that if the temporary injunction was dissolved, plaintiffs would not be deprived, without due process of law, of their right to acquire, possess and enjoy property and the gains of their industry, and would not be denied the equal protection of the law as guaranteed by Sections 4 and 30 of Article II of the State Constitution and Amendments 5 and 14 to the National Constitution. Therefore the temporary injunction was dissolved, judgment given against plaintiffs and for costs; and from the judgment this appeal was taken.

The earlier disputes of Hughes and defendant union have no bearing, we think, on the decision of this case; but the circumstances of them have been related because the briefs of both sides attach importance to them. No doubt those controversies engendered mutual suspicion and aversion between Hughes and the members of the local union, but the only conduct of plaintiffs assigned by the executive board of the union for picketing the Theatre, was that plaintiffs refused to hire a union operator to handle the picture projecting machine and persisted in having it operated by Hughes. Beyond question the demand of the union that plaintiffs should desist from conducting the business in that way and should employ an outside operator, was arbitrary and unlawful. The right asserted by plaintiffs to keep down the expense of their business by having Hughes manipulate the projector, is the simple and primitive right of a man to earn a livelihood with his own hands; as much so as that of a blacksmith to blow his forge. [Truax v. Raich, 239 U. S. 33.] This right the rule of the union denied to Hughes, even if he became a member. The controversy is not one wherein members of an organized body of employees have struck or taken other

*Preceding Disputes.*

*Picketing.*

methods to increase their wages, shorten their hours of labor, or improve the sanitation and comfort of the conditions under which they work. It is not the outcome of any grievance of organized labor that contains merit, as involving resistance to oppression or an equitable division of profits yielded by labor and capital in combination. On the contrary, Hughes claims no more, in effect, than the members of the union claim; i. e., the privilege of earning the ordinary wage of operating a picture machine by doing the work himself instead of paying to have it done. The evidence shows he had never discriminated against union operators; but on the occasion when he needed an outside operator, had employed a union man. The decision of the union to enforce against plaintiffs the rule that no proprietor of a moving picture theatre should handle his projector, was an attempt to deprive Hughes of his right to make a living by the work of his hands, and to deprive him and his partner of the right to manage their business according to their own judgment and, so far as the evidence shows, in the only method it could be made profitable; a method remotely affecting, if at all, the interests of organized labor. Clearly in doing this defendants wronged the plaintiffs. [Hopkins v. Stave Co., 28 C. C. A. 99, 83 Fed. 912.] The determination of the union to put the rule into effect against plaintiffs, involved, as the course of events shows, the intention to coerce plaintiffs into observing it by reducing the income of their business to such an extent that they must yield or be ruined. The reduction was to be accomplished by a patrol of pickets in front of the theatre and repeated untrue statements by the pickets to patrons of the theatre and other passers-by, that plaintiffs were unfair to organized labor, and by requests not to patronize them. Uneasiness, amounting to intimidation, was stirred in some of the patrons, which kept them away from the exhibitions and, no doubt, aversion to plaintiffs was aroused in others with the like result; the very result indeed that the defendants admit was intended.

This conduct of the union, including the defendants, was a violation of the legal rights of the plaintiffs which worked continuous damage to their business and entitles them to redress. [Lohse Door Co. v. Fuelle, 215 Mo. 421; Clarkson v. Laiblan, 178 Mo. App. 708.] The views expressed and the judgments rendered regarding the respective rights of the employing and the employed classes of society are discordant and may be occasionally extreme, one way or the other; but we have seen no judicial opinion which in principle or ruling would justify, as lawful, the behavior of defendants.

Defendants contend the picketing was peaceable and, therefore, lawful, and that to prevent it by the writ of injunction will deprive them of their privilege of free speech and the use of the public streets. With-Free Speech. out denying that there can be peaceable picketing, as some courts have held, we dissent from the proposition that picketing is lawful, as a matter of course, simply because it is not accompanied by assaults, threats or other methods of intimidation. In some instances we consider peaceable picketing is lawful. For example where, in the prosecution of a strike, pickets are posted to observe and report what takes place on the employer's premises, and in the course of their task use neither violence nor threats toward other employees. [Fletcher Co. v. Assn. of Machinists, 55 Atl. (N. J.) 1077; Karges Furn. Co. v. Woodworkers Union, 165 Ind. 421, 2 L. R. A. (N. S.) 788.] It has been held, but not by all courts, to be lawful in such instances, when nothing more is done by the pickets than to endeavor by argument and persuasion, to prevent other workmen from taking service under the employer against whom the strike is directed. [St. Louis v. Gloner, 210 Mo. 502; Standard Tube, etc., Co. v. International Union, 7 Ohio Nisi Prius, 87; Iron Moulders Union v. Allis-Chalmers Co., 166 Fed. 45, 20 L. R. A. (N. S.) 315.] It is unlawful, according to the authorities, when a strike is in progress, for members of a labor union to endeavor to persuade employees

to break their contracts; and doubtless picketing for that purpose is unlawful. [Martin, Modern Law Labor Unions, secs. 207, 209, and cases cited.] The question of whether peaceable picketing is always lawful, has been passed upon by the Supreme Court of the United States in a recent decision, wherein the opinion said the fundamental error of the defendants in that case consisted "in the assumption that all measures that may be resorted to are lawful if they are peaceable; that is, if they stop short of physical violence or coercion through fear of it. In our opinion any violation of the plaintiffs' legal rights, contrived by defendants for the purpose of inflicting damage, or having that as its neccessary effect, is as plainly inhibited by the law as if it involved a breach of the peace. A combination to procure concerted breaches of contract by plaintiff's employees constitutes such a violation." [Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 257.] The picketing in the case at bar, although free from assaults, except in one instance, and from threats, was not free from an intimidating influence on some of the patrons of plaintiffs' business, whether the defendants intended to intimidate or not, and the picketing was accompanied by a misrepresentation regarding the attitude of plaintiffs toward organized labor. In numerous cases, but not upon uniform reasoning or principles, relief, and by injunction, has been afforded against picketing of that character; which, in reality, amounts to a boycott. According to some courts, the fact that coercive conduct occurs in carrying out an agreement among a powerful combination of persons to compel submission to their will in some part of the management of a business, is ground for restraint in equity, even though similar efforts to coerce by one person would not be. [American Federation of Labor v. Buck's Stove & Range Co. 33 App. D. C. 83, 32 L. R. A. (N. S.) 749; Burnham v. Dowd, 217 Mass. 351; Pickett v. Walsh, 192 Mass. 572, 6 L. R. A. (N. S.) 1067.] In Massachusetts if the court deems the rule the union seeks to compel employers to observe is illegal, an injunction will be granted to re-

strain its enforcement as soon as the employer is noti-
fied it will be enforced and before overt acts to that
end are taken.   [Haverhill Theatre Co. v. Gillen, 229
Mass. 413.]   In the present case there were both notice
to plaintiffs the rule would be enforced and the prose-
cution of overt acts of an annoying and injurious char-
acter.   The motive with which corcive acts are done
against an employer is of moment according to the Fed-
eral doctrine; that is, whether the purpose of the mem-
bers of the labor organization was primarily and in
good faith to promote their own welfare, and that of the
working classes, or was principally to damage and sub-
due a proprietor.   [Hitchman Co. v. Mitchell, 245 U. S.
229, 256.]   Unless express malice against the proprietor
and a desire arising therefrom to injure him is proved
by positive evidence, the inquiry into the principal
motive of the union is best answered by considering how
closely or how remotely, in a particular case, the object
to be achieved by the union is related to the interests
of the members; a point occasionally adverted to in
discussing this subject.   [See note to Bossert v. Dhuy,
221 N. Y. 342, Ann. Cas. 1918 D. p. 661.]   In addition
to the authorities cited above, as supporting the propo-
sition that equity will enjoin interference with a busi-
ness by unlawful picketing and other methods of boy-
cotting, when irreparable damage will be inflicted, we
cite the following decisions as directly in point, and
given upon facts not materially unlike those at bar:
Roraback v. Operators Union, 140 Minn. 481; Haver-
hill Theatre v. Gillen, 229 Mass. 413; Webb v. Cooks'
Union, 205 S. W. 465; Re Langell, 50 L. R. A. (N. S.)
412 and note.

The point of difficulty is, not whether the picketing
as prosecuted was wrong, but whether the writ of in-
junction can be used to prevent it.   Decisions of this
and other courts are cited as holding it may not. An ex-
tensive examination of the conflicting pronouncements in
other jurisdictions on the subject will not be undertaken;
and instead we refer the reader to the cases we have cited,

Hughes v. Motion Picture Machine Operators.

or that are cited in the briefs of counsel, as to the different doctrines and rulings.   The courts of review of this State have declared peaceable picketing is lawful and cannot be enjoined; but the instances were where the legality of the act was determined with reference to the effect of the absence of intimidation by violence and threats, and not with reference to the harassment of the complainants and the damage to their business by the manner in which the picketing was done.   Intimidation happened in the present case, as we have stated; and in consequence of it and of the propaganda conducted by the pickets in defaming the behavior of plaintiffs to organized labor, much damage was inflicted on them, considering the small scale of their business.   They and their employees was compelled, for months, during the busiest hours of the evening, to do their work under the constant annoyance of the picketing a few feet from the entrance of the theatre.   To break the effect of the misrepresentations of the pickets, Mrs. Hughes walked the sidewalks, informing passers-by that plaintiffs were not unfair to organized labor, and it may be fairly concluded that plaintiffs were forced into this unpleasant activity to preserve, in some measure, their patronage.   To our minds such a condition of affairs constituted a private nuisance and an

Nuisance. intolerable one.   No organization should be permitted to thus vex and harrass men, at any rate when the act objected to by the organization affects so remotely the welfare of the members as in the present instance.   In truth we have found no case, except the Minnesota and Massachusetts one, cited above, where the picketing, and boycotting by other means, were for so trivial a cause. Most of the decisions were in cases of lockouts, black lists and strikes directly connected with the struggle of workingmen to better their lot, and involving large issues of general social welfare.

In most of the opinions on the subject, defamatory words, spoken or printed, are treated as acts intended to carry out an unlawful conspiracy and, therefore. to be prevented; like other acts done for that purpose;

little being said about constitutional guarantees of freedom of speech. But in a case, determined by this court, an injunction was refused to restrain the publishing of a circular declaring a boycott by the Knights of Labor against the complainant and setting forth the reasons why. The writ was denied on the ground that a court of equity has no jurisdiction to restrain the publication of a libel, and for the further reason the Constitution of the State declares every person shall be free to say and publish what he will, being responsible for what he says. [Marx & Haas Clothing Co. v. Watson, 168 Mo. 183, construing Sections 4 and 14, Article II, Mo. Const.] The proposition maintained by that opinion against the power of a court of equity to enjoin the utterance of a slander or libel, where there is nothing else in the case, is, we think sound; although it is difficult to understand how some judgments could have been given without denying or ignoring the proposition. Another decision invoked for defendants is St. Louis v. Gloner, wherein the right of persons to move about on the streets and sidewalks at their pleasure was upheld, so long as they conducted themselves in an orderly manner, and even though they were there as pickets. The case did not involve and in no way touched upon, the question of whether a person whose business is beset to the extent of creating a nuisance, may have relief by injunction. [St. Louis v. Gloner, 210 Mo. 502.] Our attention has been called to no decision, either of this or either of the appellate courts, where that question was considered or determined.

We hold that the picketing by defendants of the premises of these plaintiffs was, as carried on, a nuisance that worked irreparable injury, and is subject to be enjoined. Authority for this view is not wanting. In Gilbert v. Mickle, it was held to be a nuisance for the officials of the City of New York to have a placard bearing the words, "Strangers beware of mock auctioneers," paraded before the auctioneer's door. However, as the officers acted under the authority of a statute, making it their duty to warn strangers and others against mock

auctioneers, and the court not being clear the statute was unconstitutional or whether the complainant was a mock auctioneer, injunction was denied. [4 Sandf. Chancery, 357.] In Sherry v. Perkins, it was ruled that banners displayed in front of a person's premises, calculated to injure his business and deter workmen from taking, or continuing in, employment under him, constituted a nuisance which equity would enjoin. The inscription on the banner read: "Lasters are requested to keep away from P. P. Sherry's, per order L. P. U." The letters were the initials of the Lasters' Protective Union. The court treated the banners as having an intimidating effect and tending to prevent workmen from taking employment in defendant's factory. [147 Mass. 212.] In Vegelahn v. Guntner, two men had been stationed in front of the plaintiff's factory and kept there during the day to persuade men not to take the places of workmen who had struck. It seems, too, they were not only attempting to persuade, but used threats of injury and harm. But the court said: "The patrol was an unlawful interference both with the plaintiff and with the workmen, within the principle of many cases, and, when instituted for the purpose of interfering with his business, it became a private nuisance." [167 Mass. 92, 98.]

As said before, this is really a case of a boycott established against the business of the plaintiffs to make them submit to a rule of the union, the picketing and the statements of the pickets being the means employed to render the boycott effectual in driving the plain-Boycott. tiffs into submission. However, the petition was framed for relief only against the picketing and that wrong alone was dealt with in the judgment below. The evidence brought into view the intention of the union to compel plaintiffs to regulate their business according to the union's rule, instead of by plaintiffs' own judgment; to displace the law of the land by the rule of the union, as the criterion of the rights of the plaintiffs. As the relief sought is against the picketing, and the judgment related

to that conduct, the appeal, of course, must determine whether the judgment denying relief against the picketing was right. Yet the purpose to be achieved by the union was clearly proved, and both that purpose and the methods used to accomplish it were illegal. The method was to diminish the volume of plaintiffs' business and destroy it if necessary, by measures which were continually harrassing to plaintiffs while they were conducting their exhibition. They were in the same situation, practically, that a physician would be in, if an association of physicians were to have two men walk to and fro in front of his office and in his hearing and in the hearing of his patients, say continually, for months: "This man is a quack; please do not patronize him." We think both on principle and authority, the plaintiffs are entitled to relief by injunction against such wrongs, instead of being left to a multiplicity of actions at law. [24 Cyc. pp. 834 et seq.]

Referring to the constitutional guaranties invoked by defendants we remark that the Fifth Amendment to the National Constitution is a restraint on Congressional action only and. has no bearing on the rights of defendants in this case.

The clause of the Fourteenth Amendment, providing against a State's depriving a person of liberty without due process of law, the kindred provisions in Sections 4 and 30 of Article II of the Constitution of this State, and the guaranty of freedom of speech in Section 14 of said Article II, are not, it is hardly necessary to say, absolute rights to be exercised by a person without limit or reference to the correlative rights of others. To follow a lawful business or vocation is part of the liberty protected by the constitutional limitations; but when the business is carried on at a place or in a manner to make it a nuisance and injurious to others, it is no longer within that protection, but is an illegal act. [Joyce, Nuisances, sec. 26; Bielman v. Railway Co., 50 Mo. App. 151; Bradbury Marble Co. v. Gaslight Co., 128 Mo. App. 96.] And nuisances causing ir-

*Constitutional Rights.*

reparable damage may be enjoined.   [1 Am. & Eng. Ency. Law  (2 Ed.), p. 64.]    The privilege of free movement on the streets and of free speech belonged to defendants, but not to the extent that they might be exercised (for no legitimate purpose of defendants) in a place and manner and with the intention to annoy and damage plaintiffs.   [Medford v. Levy, 31 W. Va. 650.]

The judgment is reversed and the cause remanded with directions to the court to set aside the judgment dissolving the temporary injunction heretofore granted and to issue a permanent injunction against defendants, restraining them from picketing in front of plaintiffs' theatre.

*Woodson, J:,* concurs; *Graves* and *Williamson, JJ.,* concur in separate opinions; *Blair, J.,* dissents in separate opinion, in which *Walker, C. J.,* and *Williams, J.,* concur, *Woodson, Goode,* and *Williamson, JJ.,* concur in separate opinion of *Graves, J.*

GRAVES, J. (concurring).—Having before me both the majority and the minority opinions in this case, I am forced to concur with the views of GOODE, J., as expressed in his opinion, modified only so far as herein express ed. It is conceded throughout this case, and in the minority opinion, that in putting into force a picket of plaintiffs' business, the purpose of the local union was to carry into effect a rule of such union, to the effect that no owner of a picture show should operate his own machine. The effect of that rule was that the business of the owner was to be run by the local union, or not at all.   They went so far as to suggest to Hughes that if he re-instated himself in the union, then they would permit him to operate a machine in some other man's show, whilst the union put a man in charge of his show.   In other words, the local union would permit him to run some other man's business, but not his own.   The real question in this case is, whether or not a man, under the law, can run his own business, or shall it be run for him by a local union?   There is a mass of stuff in this case,

that has no place in it. From this mass excerpts have been made in the minority opinion. This local union proceeded upon the theory that Hughes was the joint owner of the business. The bona-fides of his ownership cannot be questioned under this record. The gist of the complaint against him was two-fold: (1) that he operated his own machine, and (2) that he had one Brown operating it, who was not a member of the union. The evidence conclusively shows that Brown was a mere student under Hughes. To find otherwise would be against the undisputed evidence of the record. So that as to one ground for interference with Hughes' business, there was no foundation in fact. As to the other, i. e. that he was operating his own machine, there is no question; Hughes admits it.

Going to the real purpose of the picketing and destruction of plaintiff's business, let us take the evidence of Wm. H. Weston, the business agent (sometimes called manager) of the local union. It was like drawing eye-teeth to get from him the real facts, but the Circuit Judge took hold of the witness and by a question or two cleared the atmosphere. In answer to his own counsel he said:

"I talked to Mr. Hughes with reference to this man Brown running his machine out there, after he had been suspended from the organization, and I talked to him along the line I would like to get Mr. Hughes to straighten up with the organization, and Mr. Hughes said he bought the show and he could not afford to pay an operator, and I told Mr. Hughes to let his wife run the show and I would give him employment at some other theater; that the attitude he was taking caused considerable trouble with other exhibitors, and it was unfair for him to run the show himself."

Notice the complaint from this business representative of the local union is two-fold, just as we have stated. When Hughes informed him that he had bought the show, he did not say to him, "You are mistaken about that Mr. Hughes, and you are shamming it." No,

he proceeds upon the theory that Hughes was the owner, but that his attitude of running his own business was giving them trouble with other picture show owners. Following this and again following the trend of his own counsel, Weston says:

"Q. What is your attitude towards employers with reference to them operating motion picture machines themselves? A. We have agreements with each of the Exhibitors' League here that they will employ union operators and they will not operate the machines themselves.

"Q. And the employers won't permit it themselves? A. No, they do not.

"Q. Did you have complaints from time to time about that? A. Yes, sir.

"Q. Claiming their contracts were being violated in that way? A. Yes, sir."

In the use of the term "we" the witness referred to Local Union No. 170, one of the defendants. Pressed on cross-examination the defendant Weston further said:

"Q. That is, your union had a contract now with the individual theater owners, and they were complaining to you about this man Hughes's conduct? A. Yes, sir.

"Q. Who were these people and how many of them were they that this local union of operators, the journeymen operators, were discussing with the theater owners with reference to this man Hughes and his business? A. Well there was two gentlemen—three gentlemen—ran a show at Southwest Boulevard and Summit. They let the operator go and one of them began operating the machine at times. That is, when we were not watching. He had a boy in there, and there was a gentleman in Kansas City, Kansas, who did the same thing at the Vendome.

"Q. That isn't what I really asked you about. A. I didn't understand the question.

"Q. I was trying to find out who it was complaining to you people.

"Mr. AYLWARD: I don't think anybody complained in particular, except there was the general complaint about running machines in this way.

Q. "I thought the employers and your union had some talk about Mr. Hughes? A. No, sir.

"Q. Did these employers of labor come to you at any time and complain about Mr. Hughes? A. No, sir; they simply let their operators go and I asked the reason why, and they said they were going to run the machine themselves if other people were permitted to do it.

"Q. So that other theater owners talked with your committee—A. (Interrupting): No, sir; not with the committee.

"Q. But with you? A. With me.

"Q. As the business manager? A. Yes, sir.

"Q. That they were going to do so and so if Mr. Hughes did so and so? A. They did it; they discharged the operator."

Then after side-stepping the question of why he, as business manager for the union, put on the pickets, the witness further said:

"Q. When Brown went, then what did you do? A. We continued picketing the theater.

"Q. Why? A. We wanted the people to know the theater was unfair to organized labor.

"Q. What was he doing that was unfair? A. He had this man and I told you he claimed he is a partner. I don't know that he is a partner; merely he is there.

"Q. Who? A. Mr. Hughes. Said he was operating the machine.

"Q. If you had known as a matter of fact that he did own the machine, *that he was a partner, then you would not have bothered him;* is that the idea? A. *I could not say.* I don't know postively whether we would have bothered him or not. *We consider any theater unfair to the motion-picture operators who do not employ* union men.

"Q. Whether they own it or not? A. *Yes, sir.*

"Q. You won't tolerate that, you say? A. No, sir. We have been—the privilege has been abused so much, you understand, that the managers will take and hire boys or men and offer them—say they have an interest in the show when they have none. There is really no interest whatever, because these men have gone out and worked under the conditions and later on becoming disgusted and come down to our organization and say, 'I had no interest whatever; it was merely a hoax to get by the operators' association.'

"Q. *Just in order to take the matter in your own hands you have adopted the rule that the owner of the machine can't operate it?*

"Mr. Aylward: I object to that remark.

"Q. You have adopted that rule? A. *We are doing it to save our organization.*

"Q. You have adopted that rule? A. Not altogether.

"Q. You say "not altogether;" what do you mean by that? A. Well, I don't know. I have never seen a case where a man who was really an owner has operated his own machine and hasn't went around and employed somebody when we were not there, under the pretext of being a partner.

"The Court: *Just a minute.. State whether or not it is a violation of the purpose of your organization for a man to operate his own machine?* A. *We consider it so; yes, sir.*

"Q. *That is all.*"

It took the strong voice of the court to get the real fact, supra, i. e., that it was against the rule and doctrine of this union for the real owner of a picture machine to run his own machine, and conduct his own business. And this it the rule and doctrine to which the minority opinion gives special assent. Such opinion says:

"The rule referred to was not a reasonless one, was adopted in good faith, had a substantial relation to the advancement of the legitimate purposes of organized labor, was not unlawful in itself, and its violation would

have justified the statement that the violator was 'unfair.' ''

That labor organizations are proper, no one denies. That they have helped humanity by the elevation of labor, no one denies. That the organization can do many things to further the interests of labor, no one denies. That they can strike and quit employment, no one denies. But all these questions are not in this case. The question here is, can a business man of limited means, whether farmer or manufacturer, picture show operator or well digger, who understands the use of all the appliances connected with his business, operate such appliances, and thereby run his own business, without having it destroyed by the silent and insidious force of a system of "picketing?" We say force, because picketing is a force, for otherwise it would not be used.

All classes of labor have the right to organize for self-protection, but self protection does not mean the unlawful destruction of property, or business, which is property. Farm laborers have as much right to organize as do picture show operators. It takes two weeks to teach a man to operate a picture show machine. It would take longer to make a good plowman. Let us suppose a case and then apply the rule endorsed by the minority to the facts. There is in a given community a "Local Union of Farm Laborers." In the same community John Jones, with a wife and six children, owns ten acres of ground for truck farming, from which the bread, meat and clothing for the household comes. Jones has a team, a plow and other appliances for the conduct of the business, and he knows how to use all these appliances, just as Hughes knew how to run a picture machine. "The Local Union of Farm Laborers," duly resolve that the owner of a farm, large or small, must not work thereon. He must go to such union for all labor. Jones can't hire help and support the family, and he follows his team and plow. Notice is served on him that he can join the union, and then be assigned by the union to plow for Smith, but he must

hire a member of the union, other than himself, to plow at home. Jones refuses, and when he takes his load of farm truck to the adjacent town for market, the union follows the wagon to the market with two pickets, who say to all his prospective customers, "Don't buy from Jones; he is unfair to union labor." Yet under the rule duly approved by the minority, Jones, who was trying, by the sweat of his brow, to earn a meager living for his wife and children, finds his products refused, because the place of his market chances to be a city where men belonging to other unions are predominant. If equity cannot relieve such a situation, we have departed from all the ancient landmarks. The supposed case is not different from the case at bar.

The differentiation of case law, most of which has no application to this case, will serve no useful purpose here. There is but one simple question to be answered, and that question is, can a man, whose business will not justify the employment of outside labor, and who is able to run his own business, be put out of business, because he cannot or will not follow the rule of a union which demands that he join the union, and go work for another, whilst the union puts in a man to run his business. I will go as far as the law will permit to encourage and help labor to ameliorate its condition, but I can't go as far as my brothers do in the specific endorsement of the rule which this local union was trying to enforce in the instant case. I therefore concur with the majority opinion by GOODE, J. I bespeak a careful reading of the record facts, to the end that the wheat may be separated from the chaff. The meat of this case lies in the one fact that this local union could not legally enforce its rule to the effect that no owner of a picture show business could operate his own machine, and therefore to enforce such rule they resort to such picketing as will result in the destruction of the business of any owner who would not assent to the rule.

Enjoining free speech has not been put into this case by the majority opinion. It is a "straw man"

erected by astute counsel for defendants, with the view that this court would spend its force knocking it down, to the exclusion of the real issue. Much has been written, and much more might be well written, on the constitutional right of free speech. An individual may write and speak what he pleases, and only becomes liable for the falsity of his utterances. But that is not this case. What may be lawful for an individual to do may be entirely illegal if done by a number of individuals acting in concert and in pursuance of a conspiracy, to injure the person or property rights of another. In other words, there may be (as recognized by equity for innumerable decades) an illegal conspiracy to do what would be a lawful act, if done by the individual, when the same act is done by the conspirators acting in concert, for an illegal and wrongful purpose. The destruction of property or property rights would be an illegal purpose. The right of free speech as guaranteed by the Constitution means that the individual citizen, in the ordinary and usual way, may write and speak what he pleases, so long as he adheres to the truth, and is only responsible when he departs from the truth, and damage thereby has been occasioned. But this right of the individual citizen does not mean that a hundred or more individuals can meet behind closed doors and conspire and agree to destroy either reputation or property rights, by their concerted action in the exercise of what they conceive to be free speech. The ordinary and usual way of exercising the right of free speech is not by walking back and forth in front of a place of business. In other words, there may be an unlawful conspiracy by a number to do what would be perfectly lawful, if done in the ordinary and usual way, by the individual. This court, by a concurrence of six of the seven members, so ruled in State ex rel. v. Assurance Companies, 251 Mo. l. c. 291, whereat we said:

"Since writing the above, it has occurred to my mind that the writer had occasion to consider the principle underlying this case, in the case of Lohse Patent Door

Company v. Fuelle, 215 Mo. 421. That case involved the questions of unlawful conspiracies to injure others, and the authority of the court to resort to injunctive relief in aid thereof.

"Counsel for respondent, in that case, cited the case of Hunt v. Simonds, 19 Mo. 583, which seems to hold to the contrary, but we refused to follow the doctrine announced in that case, and followed the better considered cases, which are as old as the common law, which hold that two or more persons, have no legal right to unlawfully conspire to injure another, even though each separately had the legal right to do what the combination had agreed to do."

We there expressly overruled Hunt v. Simonds, 19 Mo. 583, and the limited reference to such case by Division No. 2, in Darrow v. Briggs, 261 Mo. l. c. 276, does not change the rule of Court in Banc, if there should be conflict.

So in this case the majority might have well said that the evidence in this case showed an unlawful conspiracy upon the part of the members of Local Union No. 170, to destroy the property rights of the plaintiff, by their conspired and concerted act of free speech. But the majority opinion places the ruling upon the ground that the continuous acts of the pickets in front of the plaintiffs' place of business, constituted a nuisance, from which equity would grant relief. In other words the acts of the pickets, made an intolerable nuisance. The writer may have had in mind the speechless pickets at the White House some months ago. So that in writing this concurrence, we have in view the fact, that only the dissenting opinion injects the idea of free speech.

In justice to both the majority and minority opinions, I ask that the whole record evidence in this case, being pages 23 to 102 inclusive, of the abstract of record, be printed as an appendix to this concurring opinion. *Woodson, Goode* and *Williamson, JJ.,* concur in these views; *Williamson, J.,* in separate opinion.

WILLIAMSON, J. concurring).—The decision of this case, under the facts shown by the record, lies in the answers to two questions of law: First, has a man a right to conduct a lawful business in a lawful way? To ask that question is to answer it. Every man has that right. Second, have courts of equity power, by injunction, to prevent forcible interference with a lawful business, lawfully conducted, when the method and degree of forcible interference constitute a continuing nuisance? The answer is that courts of equity now have that power, and have always had it.

I do not understand that either the majority opinion by GOODE, J., or the concurring opinion by GRAVES, J., in any manner infringes upon the constitutional right of freedom of speech. I concur in both.

BLAIR, J. (dissenting).—It is believed that the learned majority opinion introduces a new rule into the law of this State. A study of that opinion, in the light of the record and the applicable law, gives rise to this dissent.

A full restatement of the facts is not necessary. A few additional facts will be stated; the facts relevant to some incidents and phases of the case, treated of by the majority, will be stated more in detail; and certain conflicts of evidence, unresolved by the majority, will be considered. Repetition will be avoided in so far as that can be done without separating important incidents from their record settings. The statement here made is intended as amendatory and not as a full substitute for that of the majority.

After joining the union in 1912, appellant Hughes entered into some sort of relation with a picture show which seems to have been located at Seventeenth and Lister. He says he employed a union man there, and that he, himself, operated a machine for a month at Ninth and Troost. He says that later he "was under contract for a place" at Fifteenth and Spruce. He had no interest as an owner, but "had a contract for a year."

He discharged Fulton, the union operator there, and began operating the machine himself. He says that while he was doing this representatives of respondent local union told him he "would have to leave that place on their request and take a job in some other part of the city, because, they said, it was against the rules for him to have an interest in a place of business and operate it himself." He says he replied, "I could not quit, or would not quit the show. I would have to quit the union first." Hughes was a member of respondent local then, and he says his answer was made the basis of a charge upon which he was fined by the local. He continued to operate the machine without other protest. The union's protest to Hughes resulted from complaints of the Exhibitors' Association, or members of it, who made the union "trouble" about what Hughes was doing. These exhibitors, non-union men themselves, argued that they had the right to operate their machines without union objection, if Hughes, a union man, was suffered to do so. Previous to this incident, as appellant's vice-president and attorney, called as a witness by appellants, testified, the union "made no complaint" about exhibitors operating their own machines. This incident brought the matter to the attention of the union. Facts began to come to light which enlisted the interest of respondent local. As the majority opinion states, "The object of the union and its rules was to improve the condition of the members and of the laboring classes in general by increasing wages and elevating the scale of living." This object is to be kept in mind throughout the case. One thing the union sought was the employment of operators at a living wage. The pertinence of this as a legitimate aim toward a thing essential to the accomplishment of the purpose of the organization is apparent. The facts mentioned as arousing the interest of the union indicated clearly that there had sprung up a growing practice among exhibitors to associate with themselves non-union operators under the name of "partners" or with the representation that they had "an interest," for the purpose and with the effect of

avoiding employing union operators. This condition was discussed in the meetings of respondent local while Hughes was a member and, it is fairly inferable, when he was present. He admitted he knew the reason the union operators objected to "employers or owners operating their own machines was that there was great danger of the employers breaking down the standard scale and living scale of wages as existed the country over, and thereby regulating, as they saw fit, the hours and conditions of labor." The reason this might result from a failure to object to such operation is clear enough from the record. Instances of the deceptive practice mentioned were put in evidence, and it was testified, without the offer of counter evidence, by appellants, that investigation showed that no bona-fida owner was found who operated his own machine. Hughes's relations with the Exhibitors' Association were such, as will subsequently appear, that refutation of this was easy if refutation was possible. Due to this condition, the respondent local adopted a rule that an exhibitor who operated his own machine would be considered unfair to the union operators. It seems probable Hughes was a member up to this time. It is not clear. The reason for the rule was that if the union recognized as "fair" the operation of their own machines by exhibitors (owners) these could, as had been done and was being done, by the simple device of dubbing a non-union operator a "partner" or representing that he had "an interest" in the show, easily conduct non-union places in competition with shows complying with union rules and "fair" to organized labor, and thus secure the benefits of the patronage of organized labor, its friends and sympathizers, while in fact, by this evasive method, discriminating against it. The view of the union was that it could not endure if a practice was countenanced which in theory would afford and in fact had afforded and was affording so convenient and effective a cover under which exhibitors could secure, had secured and were securing all the benefits of unionism and its patron-

age without conforming to its reasonable standards or accepting any of its incidental burdens.

Meanwhile, other things marched with the discussion and adoption of this rule. Just prior to August 1, 1915, and, it seems, while Hughes was operating at Fifteenth and Spruce, respondent local had under consideration the adoption of a new wage scale for the contract year which was to begin September 1, 1915. Hughes was present at the meetings at which this matter was discussed. Before final action was taken an exhibitor sent letters to his fellow exhibitors in which he gave in detail the proposal being debated, wage scale and all. Hughes was charged with divulging this information, tried, found guilty, and a fine and a year's suspension imposed as penalty. On the stand he denied this charge. The vice-president of respondent local, referred to above, and another of its officers testified Hughes, when "called for trial" before the local, admitted his guilt. This last witness said the letters were traced to the manager of the Empire Theatre by the peculiarities of his typewriter and that he named Hughes as his informant. The manager was not called, though Hughes's relations with the Exhibitors' Association at the time of the trial were in no way hostile. In fact, that association employed the counsel who conducted this case for Hughes, and its secretary sat near that counsel during the trial. The preponderance of the evidence clearly proves Hughes was guilty of betraying secrets of the union to which he belonged. This shows (1) that Hughes was not suspended and fined without sound reason; and (2) that he testified falsely about this matter in the trial court.

Another matter: Hughes testified that officers of respondent local, naming them, told him they were going to ruin his business, going to spend money to destroy it, etc. Some of these statements, he says, had reference to theaters other than the one involved in this case. As to these he is contradicted by the men he says made the statements, and by the fact that he was not interfered with in any way in connection with the places he then

conducted. As to the statements of this character, which he says pertained to the theater involved here, he is contradicted by the four witnesses who, he said, were present when the statements were made. The great weight of the evidence is against him, and the only conclusion which is justified is that in this respect, also, his testimony was untrue.

There is testimony of more than one witness that Hughes had announced he intended to "break up this little nest of operators." He denied this. The testimony of the witnesses mentioned, his divulgence of union secrets to the employers, the undenied testimony that he had sought the discharge of union operators by other exhibitors, and his efforts in this case, by the false testimony already pointed out, to give a cast of actual malice to the action of the union through its officers, convict him of again testifying falsely.

In October, 1915, Hughes says he acquired an interest in a theater at Thirty-Ninth and Main. Admittedly, the union operator was discharged and Hughes operated the machine, without interference from the union until he severed his connection, whatever it was, with that theater,

Wesley Briner owned a theater at Ninth and Lister —the Eastern Theatre, which is involved here. Hughes's connection with this place began on January 3, 1916. On the trial Hughes was asked what his business was, or where he worked. He answered, "I own and operate the show located at Ninth and Lister." Later he testified that "on January 3, 1916, I took possession of the Eastern Theater." He then said he was "associated" with Wesley Briner in that enterprise. He was asked, "You and he were partners owning this business?" He answered "Yes, sir." The first step taken after he "took possession" of the Eastern was that "we gave" the union operator then employed there "two weeks' notice." Subsequently he testified he did not discharge this operator, but that Briner did so. Briner had a contract with the operator requiring two weeks' notice, Hughes said.

Respondent's vice-president and attorney, previous-
ly referred to, was called as a witness by appellants'
counsel, as stated.  He testified that with the facts in
mind that Hughes had discharged a union operator at
Thirty-Ninth and Main, and that his appearance at the
Eastern was immediately followed by the discharge of
another at the Eastern, he investigated the state of the
City and Federal licenses and found that there had been
no transfer of licenses, and that "according to the City
and Federal governments he (Hughes) didn't own a
dollar" in the Eastern Theater, and witness reported to
respondent local that Hughes was a "strike breaker, try-
ing to put our operators out of business." Under the
Act of Congress of October 22, 1914, which by its terms
extended until January 1, 1916, and by resolution of
December 17, 1915, was continued in force until December
31, 1916, the owners of theaters were taxed and required
to "keep such records and, under oath, such statements
and returns, and shall comply with such regulations as
the Commissioner of Internal Revenue, with the approval
of the Secretary of the Treasury, may from time to
time prescribe." Quite conceivably such requirements
lawfully could include sworn statements of ownership and
changes therein. It is to be noted the witness did not say
merely that the investigation of the Federal office failed
to show Hughes was interested.  He testified the result
showed affirmatively that Hughes "didn't own a dollar"
in the Eastern Theater.  Appellants got this testimony
into the record by a witness they called. After proving
this, they might have extricated themselves if they had
shown that no returns were required, such as the testi-
mony of the witness necessarily implied were required.
Doubtless they would have shown this if it had been true.
The trial occurred in July, 1916.  No effort was made to
show the fact to be otherwise than the witness stated.
No explanation of the fact, the truth of which was thus
acquiesced in, was attempted.  Hughes was not recalled.
Briner was not a witness nor was his absence accounted
for.  In this situation the question whether Hughes is to

282 Mo.—22

be believed again emerges. His previous attitude toward the union, his efforts to secure the discharge of union operators at places in which he claimed no interest, his threats to "break up that little nest of operators," his knowledge of the practice of simulating partnerships to circumvent the union, and his previous success in operating as an owner, or pretended owner, without interference, despite the rule of the union, are to be considered. Also, as we have already pointed out, he did not hesitate to testify untruthfully with respect to other relevant matters. Considered together with the testimony mentioned, the lack of attempted refutation when records were accessible to refute the testimony unless they confirmed it, the way in which Briner washed his hands of the case, so far as testifying is concerned, the failure to produce a contract, it being somewhat likely that one would be written if made at all in a case involving partnership of the kind, the whole is convincing that Hughes's claim of an interest was unfounded and that in fact he *"didn't own a dollar"* in the Eastern Theater; he was merely using a subterfuge, previously employed by others also, to work as a non-unionist without subjecting the Eastern to a charge of unfairness to organized labor. He had accomplished this as an owner, or prentended owner, at other places and doubtless thought he could do so again.

Another officer of the union visited the Eastern and found Hughes had a young man named Brown "in the booth." As stated in the majority opinion, the weight of the evidence is that Brown was learning the business under Hughes. There is evidence, however, that Brown had progressed to such an extent that he was operating the machine alone when seen by one of the union officials. It also appeared that he was under instruction for about twice the period necessary in the average case. It was said this was due to irregular attendance.

The majority opinion does not make quite clear the reason for the picketing. In one place it is stated that the sole reason assigned by the executive board for picketing the theater was that "plaintiffs refused to hire

a union operator to handle the picture projecting machine, and persisted in having it operated by Hughes.'' In another connection the Brown incident seems to be given some weight. The testimony offered by both appellants and respondents shows that the picketing at the time this suit was begun (June, 1916) was being done because it was believed that Hughes had no interest in the Eastern Theater, but was claiming an interest for the purposes already mentioned. This belief, as previously pointed out, was a well founded one. The general ground was assigned that the place was unfair.

The majority opinion refers to ''intimidation'' as if it were a fact in this case. In truth, it states expressly that there was intimidation. The majority make it reasonably clear that they do not rely upon the incident where Mrs. Hughes is said to have been knocked down. The reasons this incident furnishes no ground for holding there was intimidation in this case are quite clear. Neither side seemed to desire to have the particulars developed. The eye-witness who testified about it was not asked to relate any of the circumstances which would show its real relation to the facts of this case. The bold fact, alone, was stated. This incident occurred in April, about three minutes after the picketing was begun the first time. For a matter of two months, the picketing, after it was resumed some days later, continued before this suit was begun. The picket charged with the offense mentioned was not permitted by the local to return. In fact, all picketing was discontinued for some days and was begun again only after that interval.

The details of the testimony concerning the incidents upon which the majority base their conclusion that there was intimidation are as follows: Mrs. C. R. Miller testified that she went quite often to the Eastern Theater with her sons, thirteen and fifteen years old; her husband was a street railway conductor and did not attend with her; he told her that she and the children ''should not go down there any more; he thought we would be in danger; that he was afraid the place might be blown up

by these pickets; he thought it was dangerous for me
to go down there and take the children." Witness at-
tended no more until the picketing was stopped by the
injunction in this case. She had gone once since that
time. Her sons did not testify.

Elijah Summers testified that he and his children
attended the Eastern Theater at times; that one Sunday
evening he was on his way to his father's and stopped
at the theater and took his little boy out; that he was
"afraid there would be trouble up there." He saw "fif-
teen or twenty out there;" two pickets were walking up
and down in front of the theater; some of the persons he
noticed stood on the one corner and some on the other
corner; he couldn't understand what they were saying;
didn't know what their business was; didn't know any
of them except he had seen the pickets before; the men
standing on the corner "might be a hundred feet" from
the ticket window of the theater; thought there "might
be a fight or riot there."

Summers' testimony entirely fails to show any fact,
word or condition which justified any apprehension on
his part. Neither his testimony nor that of any other
intimated that the persons on the corners a hundred feet
away from the theater ticket window were in any way
connected with any of the respondents—or with Hughes.

Mrs. Miller's testimony shows that her husband's
alarm, if in fact he had any, was not due to anything the
pickets did. It dones not appear he ever was nearer the
theater than his home, four blocks away and on a differ-
ent street. Mrs. Miller, the witness, who attended the
theater, confessed no feeling of alarm.

In considering these incidents for the purpose of
determining whether they justify the finding in the
majority opinion that there was intimidation, it is to be
kept in mind that the opinion does not proceed upon the
theory that all picketing necessarily contains the element
of intimidation. If it so proceeded there would be no
reason for its consideration of specific instances. It in
fact expressly states it does not decide that intimidation

is an inevitable component of all picketing. With this in mind, the question is whether these incidents, independent of the theory of law referred to, of and in themselves, prove intimidation as a fact. It is clear they do not. Summers's testimony presents not a scintilla of evidence of a basis for any apprehension. The same is true of Mrs. Miller's testimony. The husband's apprehensions, if any, were drawn solely from the fact that picketing was going on. Unless the rule is adopted, that picketing, no matter how it is done, necessarily includes intimidation, these incidents prove nothing. If that rule is adopted, they become unnecessary. Before facts, if facts are required, are held to show intimidation of a sort to justify enjoining picketing, those facts ought to be such at least as to give rise to *rational* apprehension Otherwise there can be found an unstable person or two in any community, with an over active imagination, who will appear with some such story as that of Summers or Mrs. Miller to introduce into every case, as a fact, the element of intimidation. The view that a court of equity ought to permit itself to be put in motion by the baseless conjectures of exceptional individuals in each community is an unsatisfactory one. The correct conclusion of fact on this matter is that no inimidation was shown.

There is another incident referred to by counsel but which does not seem to be mentioned in the majority opinion. The omission is quite proper. That incident in no way tended to prove intimidation. It merely justifies some uncomplimentary remarks about certain individuals which are well enough left unmade since the proper consideration of the case does not require that they be made.

The record shows that the picketing was "peaceful." There was no interference with patrons or pedestrians. The pickets spoke in a conversational tone and addressed the public, not individuals; no efforts at persuasion, in its ordinary sense, were made; the pickets stated that the theater was "unfair to union labor; please do not patronize it;" there was never any obstruction of the sidewalk or entrance to the theater; the pickets never

walked abreast, but single file or one in each direction; there were no loud words, no threats, no violence, no black looks, no ridicule. There were never more than two pickets on duty. There was no evidence that other members of the union in any way interfered with the patronage of the theater, directly or indirectly. The public was informed that the theater was unfair and that public then went its way and patronized or did not patronize, as it saw fit, without further advice, or request from the pickets or the union. There was no personal solicitation of individuals. If "peaceful picketing" is a legal possibility, a thing not denied by the majority opinion, this record amply shows an instance of it.

Hughes's offer, even had he made one, to join the union if they would modify their rules amounts to nothing. If he desired to join he might do so if the union would accept him. There is nothing to indicate he had any legal right to impose membership conditions upon the union. Such offer could not affect the question here. That depends upon the identical things upon which it would have depended had he made no such offer.

With these amendatory suggestions as to the facts, the law of the case will be briefly considered.

I. The majority opinion seems to place the reversal of the judgment on the ground that the record shows a number of things which, in combination, constituted a nuisance. It states that (1) the union demands were arbitrary and unlawful; (2) the union was attempting to deprive Hughes of the right to "make a living by the work of his hands;" (3) there was intimidation of patrons; (4) that the statements made by the pickets that the theater was "unfair to organized labor" were false statements; (5) that the rule and the picketing had no substantial relation to the promotion of the welfare of union men; (6) that some of the attendants of the theatre were "forced into unpleasant activity to preserve their patronage;" (7) that the patronage was diminished; (8) that these things show the theater was so "be-

set'' that a nuisance was created, and could be and should be enjoined.

II. It is to be kept clearly in mind that this is not an action for damages. The question is whether a court of equity can and ought to use the writ of injunction against the picketing shown by the record.

(1) The majority opinion, as already pointed out, falls into error of fact in holding there was intimidation in fact in this case.

(2) (a) The majority hold that the statements of the pickets that the theater was unfair to organized labor were untrue, and some stress is laid upon this. The Intimi- majority, as already noted, fall into another dation. error of fact in respect to Hughes's real relation to the Eastern Theater. As shown, the preponderance of the evidence requires the finding that he was merely a non-union operator employed at the Eastern and endeavoring to evade union protests by the pretense that he was a partner. This being true, the holding of the majority is wrong on the facts. It is hardly to be supposed that if the fact stated is accepted it could be doubted that the statements of the pickets were true, unless there can be no ''unfairness'' to organized labor—a view not accepted anywhere so far as investigation discloses.

(b) Even if Hughes had been an owner, would the majority opinion be right in this connection? To what extent will the courts decide what rules union labor organizations may adopt and follow on this question of fairness and unfairness? According to the Supreme Union Court of California, the justice or policy of union Rules. rules, adopted in good faith, are matters outside the province of the courts ''and with regard to other questions of economic or political aspect, the remedy, if remedy is needed, must be found by the Legislature.'' [Parkinson Co. v. Council, 154 Cal. 581.]

It is unnecessary to attempt in this case the formulation of the rule on this subject. There can be no question that the rule that an exhibitor who operated his own

machine would be deemed unfair, originated out of a real condition which threatened the welfare of respondents. Hughes admitted he knew this. The evidence is clear that the rule was not adopted in a spirit of malice or frivolity or otherwise than as the result of a well founded conviction that it was necessary for the preservation of respondent local and a furtherance of its lawful purposes. That the practice at which it was aimed was one of deceit and unfairness, objectionable to honest exhibitors as well as to the union, is also shown by the evidence. That the rule had a real relation to defeating this underhand practice and thereby preventing the disruption of the union seems apparent to the writer. In addition, it seems reasonable that the principal of the majority opinion now being discussed logically expends its force upon the question of malice. It is relevant to that inquiry when that inquiry is relevant to the issues. The rule referred to was not a reasonless one, was adopted in good faith, had a substantial relation to the advancement of the legitimate purposes of organized labor, was not unlawful in itself, and its violation would have justified the statement that the violator was "unfair."

(3) Another holding of the majority is that the "union demands were arbitrary and unlawful." That they were not so if Hughes owned no interest in the theater,

**Unfair Representations.** hardly be contended, unless it is to be (which is not said) that unions have no right to withdraw their patronage from picture shows which employ non-union operators. For the same reason given under (2) (b) supra, the demands were not open to this criticism even on the theory of fact in the majority opinion.

(4) If the picketing was otherwise lawful, the fact that appellants were forced into unpleasant activity to preserve a patronage to which they were not entitled and which they had attempted to retain by deceit, or at any rate despite their unfairness to organized labor, is not an objection to the judgment of the trial court. If so, there is always, in every case, no matter what may be the

justice of organized labor's grievance, at the disposal of every man who desires to use it, an effective method of putting injunctive proceses in motion.

III. The other heads, (2), (7) and (8) simply raise the question whether picketing can always be enjoined, regardless of the manner in which it is done.

The majority opinion seems to concede that the rule in this State is that peaceful picketing, at least when it is for substantial grievance, affecting the welfare of labor, cannot be enjoined. On its face, the opinion does not deny the soundness of this rule. It seems there is thought to be some distinction between picketing during a lawful strike and picketing in a case like this. The right of an employer to unimpeded flow of labor to his mills for employment is not different in principle from the right of a picture show owner to the unhindered patronage of the public. Neither right is unqualified. The right to convey to the prospective employee of a manufactory, or prospective patron of a theater, information concerning the unfair attitude toward labor or employer or show owner is the same right.

Cases dealing with secondary boycotts (Lohse Door Co. v. Fuelle, 215 Mo. 421) and those involving efforts to coerce the discharge of a workman and the breach or cancellation of subcontracts (Clarkson v. Laiblan, 178 Mo. App. 708) involve different and not relevant questions. The Missouri cases cited in the majority opinion and in the briefs disclose that the courts of this State have long recognized "peaceful picketing" and have justified it on principle. Despite sporadic remarks to the contrary, this is the rule supported by the weight of authority in this country. In Martin's Law of Labor Unions, sec 169, p. 233, it is said this rule is the "view taken by the majority of decisions and" is "best supported by reason." In 16 R. C. L. p. 454, sec. 33, it is said the courts which condemn picketing altogether "are in a decided minority" and that in cases announcing this minority rule the showing sometimes includes actual intimidation, i. e. the purported holdings are *obiter dicta*.

Picketing.

A few decisions apparently define the word "picketing" in such manner as to include violence in its very nature, and then hold in effect that the picketing in the particular case includes it because it is picketing. These decisions do not advance the argument. Other authorities also agree that the weight of authority supports the rule of this court. See note to Jensen v. Union, 4 L. R. A. (N. S.) 302, and note to In re Langell, 50 L. R. A. (N. S.) 412.

In speaking of the view of the majority of the courts, including this one, Martin states (Sec. 169, supra) that of the fact that it is "correct there can be no doubt." This immediately follows favorable comment upon the decision in St. Louis v. Gloner, 210 Mo. 502.

Some of the decisions supporting the minority rule seem to have given weight to decisions on the former English statute concerning the "besetting" of a place of business or residence. That statute has been amended so that the present English statute is such that it has been declared to be a fair "codification of the law relating to peaceful picketing as laid down by a majority of the American courts." It is unnecessary further to discuss this. The majority opinion does not assail the rule.

We are now asked by counsel to change the rule long in force in this State, abandon the position supported by the courts of most of the states, and hold picketing unlawful *per se*. If the facts are as we have stated them, this is the net result of the majority opinion, despite its failure to challenge directly the existing rule. The matter is one which affects the relations between two great bodies of citizens of this State. It is one constantly before the public, is of great public interest and long has been. The decisions of this court years since established in this State the principle and rule pointed out. The people at large, advised of that rule and of its practical workings, have taken no steps to change it. It is unlike an ordinary rule of law in that respect. Most of them never catch the public attention. This rule must have done so. What appellant asks in this case is rather a change of

policy than a reversal of a rule of law relating to absolute rights. There is no impropriety, under facts like those in this case, in considering the public approval of the existing rule, inferable from the long acquiescence of the public and its representatives therein. In such circumstances, under all the facts of this case, the change sought, if it can constitutionally be made, is one rather to be sought in the Legislature than in the courts. The arguments advanced do not convince the writer that this court ought to adopt the principle for which counsel so strenuously contend.

IV. Even if the majority holding that intimidation was proved in this case could be adhered to, yet, unless its view of the union's reason for picketing is sound in both fact and law and furnishes a ground of injunction, Intimida-  the injunction directed ought to be limited to tion.      the unlawful acts of intimidation, unless the majority intend to hold that all picketing is unlawful. The decisions which warrant this conclusion are numerous.

V. In the opinion of the writer the majority and the concurring opinions not only fall into the errors of fact and law already pointed out, but attempt to introduce a rule which is in direct conflict with constitutional guaranties. The principle has been discussed by Constitutional this court heretofore. The rule which the Guaranties.  court now purposes to write into the law of Missouri is one which neither it nor the Legislature, nor both, nor any other has the constitutional power to write into it, while our Bill of Rights is permitted to stand.

"Section 14 of our Bill of Rights declares that 'no law shall be passed impairing the freedom of speech; that every person shall be free to say, write or publish whatever he will on any subject, being responsible for all abuse of that liberty.' The evident idea of that section is *penalty* or *punishment, and not prevention.* Because, if *prevention* exists, then no *opportunity* can possibly arise for one becoming responsible by saying, writing

or publishing 'whatever he will on any subject.' The two ideas, the one of absolute freedom 'to say, write or publish whatever he will on any subject,' coupled with responsibility therefor, and the other idea of *preventing* any such free speech, free writing or free publication *can not coexist*. And just here it must be observed that the right of free speech, free writing or free publication were not *created* by the Constitution which recognizes those rights as now existing and only seeks their protection and perpetuation. [Cooley's Const. Lim. (6 Ed.) 511 et seq.] That instrument simply forbids *any law* to be passed impairing the freedom of speech, and then gives a general and perpetual guaranty against any interference *from any quarter whatever*, with the freedom of every person 'to say, write or publish, whatever he will on any subject.' Language could not be broader nor prohibition nor protection more amply comprehensive. Wherever within our borders speech is uttered, writing done, or publication made, there stands the constitutional guaranty giving staunch assurance that each and every one of them shall be *free*. The Legislature cannot pass a law which even *impairs* the freedom of speech; and as there are no exceptions contained in the rest of the quoted section, the language there used stands as an *affirmative prescription* against any exception being thereto made, as effectually as if words of *negation* or *prohibition* had *expressly* and *in terms, been employed*. . . .

"The rights then set forth and designated in Section 14 are '*excepted out of the general powers of the government;* all laws contrary thereto are void, and so long as such provisions of the Bill of Rights continue in force they remain absolute and unchangeable rules of action and decision.' And, as the learned author and eminent jurist just quoted says in another place with great force: 'The securities of individual right . . . cannot be too frequently declared, nor in too many forms of words, nor is it possible to guard too vigilantly against the encroachments of power, nor to watch with too lively a suspicion the propensity of persons in authority to break

through the 'cob-web chains of paper constitutions.' [2 Story's Const. (Cooley's Ed.), sec. 1938.]

''Section 14, supra, makes no distinction and authorizes no difference to be made by courts or legislatures between a proceeding set on foot to enjoin the publication of a *libel* and one to enjoin the *publication of any other sort or nature, however injurious it may be,* or to prohibit the use of free speech or free writing on any subject whatever; because wherever the authority of *injunction begins,* there the right of free speech, free writing or free publication *ends.* No halfway house stands on the highway between *absolute prevention* and *absolute freedom.* The rights established by Section 14 can neither be impaired by the Legislature, nor hampered nor denied by the courts. Nor does it in any way change the complexion of this case by reason of its being alleged in the peition 'that the defendants and each of them is without means and has no property over and above the exemption allowed by law wherefrom the plaintiff might secure satisfaction for the damages resulting to it from the acts aforesaid.' *The Constitution is no respecter of persons;* the impecunious man 'who hath not where to lay his head' has as good right to free speech, etc., as does the wealthiest man in the community. The right to enjoin in the former's case is precisely the same as in the latter's; no greater and no less. In short, the exercise of the right of free speech, etc., is as *free from outside interference or restriction as if no civil recovery* could be had or *punishment inflicted because of its unwarranted exercise.*

''And in this connection, it is to be constantly borne in mind that the principle is firmly rooted in equity jurisprudence that though there be no remedy at law, this does not necessarily and of itself give a court of equity jurisdiction to afford relief. The authority to enjoin finds no better harbor in the empty pocket of the poor man than in the full pocket of the rich man. And such authority to enjoin can have no existence in circumstances such

as the present case presents, if the Constitution is to be obeyed.

"If these defendants are not permitted to tell the story of their wrongs, or. if you please, their supposed wrongs, by word of mouth or with pen or print, and to endeavor to persuade others to aid them by all peaceable means, in securing redress of such wrongs, *what becomes of free speech, and what* of personal liberty? The fact that in exercising that freedom they thereby do plaintiff an actionable injury, such fact does not go a hair towards a diminution of their right of free speech, etc., for the exercise of which, if resulting in such injury, the Constitution makes them expressly responsible. But such responsibility is utterly incompatible with authority in a court of equity to prevent such responsibility from occurring."

Those were the views of this Court, En Banc, in Clothing Co., v. Watson, 168 Mo. 1. c. 143. They are as applicable to the right to speak as they are to the right to print. The court then had before it about the same arguments which appear now in briefs of counsel and in the majority and concurring opinions in this case. There was the contention that Haas could run his business to suit himself and that a court of equity should suppress the giving of information (in that case by printed circular) of the grievances defendants thought they had against him. This court answered those arguments, as quoted portions of its opinion show. They were then and are now arguments which are no more sound against respondents than they would be in support of an effort to induce this court, by injunction, to censor the press of this State. If the court can, under our Bill of Rights, close the mouth of the individual by injunction, it can, as well, lay its restraining hand upon the newspaper. The Gloner case is also in point in principle. If the former decisions of this court are to be overruled, they should be overruled in terms. If the language of the Constitution is to be held to mean what the opinions men-

tioned imply, it should be done expressly and not by implication.

For the reasons given, I respectfully dissent. *Walker, C. J.,* and *Williams, J.,* concur in these views.

## APPENDIX.

(Being pages 23 to 102 of the Abstract of the Record, called for by Opinion of GRAVES, J.)

JOHN E. HUGHES, called as a witness on the part of the part of the plaintiffs, having been first duly sworn, testified as follows, to-wit:

DIRECT EXAMINATION BY MR. BOYLE.

Q. What is your name? A. John E. Hughes.

Q. You are the Hughes that is referred to here as plaintiff in this controversy? A. Yes, sir.

Q. What is your business, or where do you work? A. I own and operate the show located at Ninth and Lister.

Q. Have you any other occupation? A. Yes, sir; to some extent.

Q. What is that? A. I work at the postoffice.

Q. The Kansas City post-office? A. Yes, sir.

Q. What is your business there? A. Carry mail.

Q. You are mail carrier? A. Yes, sir.

Q. How long have you been a mail carrier in this city? A. Five years.

Q. When did you become interested in this picture show that is referred to in the pleadings? A. The 3d day of January, 1916.

Q. You were then a mail carrier, were you? A. Yes, sir.

Q. And still are in the same position? A. Yes, sir.

Q. Had you been prior thereto engaged in the picture show business in any way as an employee or owner? A. Both.

Q. Did you belong to the local operators' union, the defendant here in this case? A. Yes, sir.

Q.   That is, you were a union man?   A.   At one time.

Q.   And when was that?   A.   For a period of about three years, starting in about 1914 or 1912, along in there.

Q.   Were you then working as a journeyman operator in some of the picture shows in Kansas City?   A. Yes, sir.

Q.   During that period of three years you belonged to the union did you become interested as an owner in any picture show property?   A.   Yes, sir.

Q.   I mean other than this one we are. talking about?   A.   Yes, sir.

Q.   Where?   A. Located at Seventeenth and Lister.

Q.   I don't know that I asked you when you became interested, if at all, in this property that is in question in this petition?   A.   The 3d day of January, 1916.

Q.   And at that time you were a member of the local union of the defendant?   A.   No, sir.

Q.   Well, now, when had you ceased to be a member of the local union of operators?   A.   The first of September of the year 1915.

Q.   Was that before you became interested in the property that is here in question?   A.   Yes, sir.

Q.   Were you then interested in some property as an owner when you quit the union?   A.   No, sir.

Q.   Under what circumstances did you quit?   A. Because they fined me one hundred dollars for, they claimed, divulging union secrets.   Fined me one hundred. dollars or expelled me for one year, and gave me my choice of either one, and when I was visited by members of the executive board I informed them I would not pay the hundred dollars fine, so as a result they put the one hundred fine and the year's expulsion together and had that as a charge against me for divulging union secrets. That was the charge they had against me.

Q.   Did you have some trouble with them prior to that time?

MR. AYLWARD: Objected to as leading and suggestive.

Q. What was your relation with the union prior to that time? I mean only in so far as this question of being connected with the picture show as owner or otherwise? A. I don't quite understand the idea.

Q. Well, did you ever have any difficulty with the union because you were the owner of a picture show? A. Yes, sir.

MR. AYLWARD: I submit he ought to let him testify-

Q. Just tell about it. A. While I was under contract for a place located at Fifteenth and Spruce I was visited by members of the executive board one evening and informed I would have to leave that place on their request and take a job in some other part of the city, because they said it was against the rules for me to have an interest in a place of business and operate it myself.

Q. Where was that place of business? A. Fifteenth and Spruce.

Q. That wasn't this place? A. No, sir.

Q. That was a picture show? A. Yes, sir.

Q. Did you have an interest as owner in that picture show? A. Not as owner, but I had a contract for one year. Working under a contract, myself and her—

MR. AYLWARD (interrupting): I object to that because the contract is the best evidence. I object on that ground.

MR. BOYLE: I think that is well taken.

THE COURT: Proceed.

Q. Did you quit there? A. Not until after the union had fined me a hundred dollars because one of the members of the executive board, after visiting me that evening I told him I could not quit or would not quit the show, I would have to quit the union first. That made him sore and he stated that was an awful bad remark for me to make that I didn't care if I quit the union or not, and that he would prefer charges against me in the union for stating that.

Mr. Aylward: I move to strike out the answer, for the reason it is stating a conclusion of the witness. He can tell what was said and done.

The Court: Motion overruled.

Q. Well, did you quit that place of business or did you remain there? What did you do? A. I remained there for some length of time until my contract expired. That is, after I was not a member of this union.

Q. Who was this executive officer who talked to you, who was a member of the defendant union? A. A man by the name of John Herring.

Q. He was one of the officers of the union, was he? A. Yes, sir; at that time.

Q. Now, when was that? A. That was about the middle of August, 1915.

Q. What did you do after your year's contract expired with that picture show? A. I quit that place and after about a week's time I bought a place, together with a partner, located at Thirty-ninth and Main.

Q. That is this place here? A. No, sir.

Q. That is in Kansas City, Missouri, is it? A. Yes, sir.

Q. You were not then a member of the union? A. No, sir.

Q. By the way, you had learned this operative's trade, had you, while you were a postoffice carrier? A. Before.

Q. Before then? You worked as a carrier in the day time and worked at the picture show at night, is that the idea? A. Yes, sir.

Q. Now, you then bought an interest, as I understand, in the place at Thirty-ninth and Main? A. I bought an interest in the place at Thirty-ninth and Main, known as the Rex Theater.

Q. Well, did you operate the machine there yourself? A. When we bought that place there was a union operator employed and the rules of the union were we would be compelled to sign a contract good for a year, to expire the first day of September this year.

Q. That is, expire the first day of September? A. Yes, sir.

MR. AYLWARD: I move that the answer and question be stricken out as stating a conclusion.

THE COURT: Motion overruled.

Q. Go ahead. A. And I refused to sign the contract and called upon the business agent and informed him I intended to run the place myself as I had an interest there and it was my intention to operate that machine myself, and after about a week's time I paid the operate off and took the job and run it for a matter of about two months.

Q. Do I understand you to say that some person representing the union had come to you and talked with you about it? A. Yes, sir.

Q. Whether or not you could operate the machine in that place that you had a partnership interest in? A. Yes, sir.

Q. And you told him you were going to operate it yourself, is that the idea? A. Yes, sir.

Q. Who was that you talked to? A. The business agent of the local.

Q. Do you remember his name? A. Yes, sir.

Q. Well, tell it. A. Mr. Weston—William Weston.

Q. You then worked there at your own place, operating the machine, for how long? A. For a matter of about two months—eight weeks.

Q. During that period did you have any trouble with the union? A. None whatever.

Q. Then what did you do? A. We sold out and that was about the middle of December, 1915, and on January 3, 1916, I took possession of the Eastern Theater, located at Ninth and Lister.

Q. Who was associated with you in that enterprise? A. Mr. Wesley Briner.

Q. You and he were the partners owning this business? A. Yes, sir.

Q. Now, this theater that you are talking about now, that you and this man Briner are interested in, is located where? A. Ninth and Lister.

Q. And is the property spoken of in the pleadings here? A. Yes, sir.

Q. And after you took possession of that property, as you have stated, what occurred between you and any member of the defendant union? A. Well, Mr. Briner was operating this place for some length of time before I come there, and he had a union man employed—

Mr. Aylward (interrupting): I move that that be stricken out, because he certainly could not know except by hearsay.

Q. When you went in there with Briner was there a union man in charge of the machine? A. Yes, sir.

Q. What was the name of this union man, if you remember? A. Oliver Shuttler.

Q. He belonged to the local union of operatives the defendant union here? A. Yes, sir.

Q. Well, what did you do about that union operator? A. We gave him the two weeks' notice, according to the contract Mr. Briner had signed with the union, and let him work the two weeks time out and during that time the union took up my case before the organization and decided that if I would—that they would cut my fine down to $75 if I would give them that amout in cash and I would then be in good standing. I asked them if I would pay the $75 if they would allow me to operate my own place of business out there which I was interested in, and they told me under no consideration would they do that.

Q. Who were you talking to when that occurred? A. That was the executive board, consisting of William Weston, also business agent, and Frank Cawood, a man by the name of William McCullough and Frank Cessna.

Q. What further took place between you and them then by way of conversation, or otherwise, as to this proposition of you being permitted to operate your own machine? A. Well, they informed me if I would pay

them that amount of money I would be considered in good standing and that I could then go on the extra list and take the first opening that came, and in the meantime I would have to have a man employed out there and pay him the union scale, and under any consideration I was not to have anything to do with the running of that place of business that I was interested in.

Q. You mean the place of business or the machine? A. The machine or in fact anything pertaining to this particular place.

Q. Well, did you go back in the union under those terms? A. No, sir. I told them I didn't think that was a fair proposition and according to the contract that this operator's time would expire the following Sunday, and that it was my intention to take the machine myself on Monday, which I did.

Q. What did they say to you when you told them you were going to do that? A. Well, they threatened to boycott me. They said they would put their pickets out there and keep them there until I would agree to their propostion.

MR. AYLWARD: I move that the answer be stricken out as stating an improper conclusion; because no proper foundation has been laid; these defendants have not been identified; I want to know who he was talking to.

Q. Was this the defendants you spoke of a moment ago—the same committee? A. The same committee.

Q. (By MR. AYLWARD): That is, Weston, Cawood and Cessna? A. Yes, sir.

Q. (By MR. BOYLE): Did you take possession of your own machine and run it? A. Yes, sir.

Q. What followed? A. I ran unmolested until about the middle of May—April.

Q. When was that? A. That was the 17th day of April that they first came out to attempt to boycott me after I had taken the machine myself.

MR. AYLWARD: I move that the term "boycott" be excluded. It is passing on a legal proposition here.

THE COURT: Motion overruled.

Q. How long had you been in charge of this machine and operating it, as you have indicated? A. A matter of about two months.

Q. During that period of time there was no picketing going on? A. No picketing and none requested as far as I know whatever.

Q. Did you have any meeting with this committee of the union, or otherwise? A. None other than the one before I took possession.

Q. During that interval of time, these two months that you have just spoken of, did you employ anybody? A. No, sir.

Q. To assist in the operation of this machine, directly or indirectly? A. No, sir.

Q. This motion picture machine, that is the machine, is it, that throws the light on the screen? A. Yes, sir.

Q. And it requires mechanical knowledge and skill to operate that machine, does it? A. Not very much; no, sir.

Q. Well, anyway, does it require some experience? A. Just a slight one.

Q. The men who operate these machines throughout the city here at the various picture shows, as a rule are they union men or otherwise, or do you know? A. About seventy-five per cent are union men.

Q. This union is made up of men who operate similar machines to the one you had in hand? A. Yes, sir.

Q. And you had been a member of that—that is what you have been telling us about, that union? A. Yes, sir.

Q. Now, after these two months of operating this machine that you are speaking about, in your theater, what then happened, if anything? A. The members of the executive board, together with the business agent, came out and told me that they were there that evening with the intention of either putting in their operator or putting their pickets to work on my place, and they said

they had both there and I could take my choice of either one. I told them I had ought at least to have a little time to consider putting on a union operator, and he says, "Well, you have either got to put on the operator tonight or else the pickets go to work.". I told him I could not agree to that at that time, and I stepped in to start the picture machine, and they informed the pickets to go to work, which they did start picketing the place, and I had been inside of the place about five minutes when some lady came in and told me one of the pickets had knocked my wife down.

MR. AYLWARD: I move that that be stricken out—what somebody told him.

THE COURT: Motion sustained.

To which ruling and action of the court the plaintiffs then and there at the time duly excepted and still except.

Q. Anyway, was there any disturbance there that night after the picketing started?

MR. AYLWARD: Objected to as calling for an improper conclusion on the part of the witness.

THE COURT: Objection overruled.

A. Yes, sir.

Q. Well, from then on just tell the court what was your daily or nightly experience with this picketing proposition. A. Well, from the time I left the booth that evening I came down and found my wife lying on the sidewalk unconscious, and I saw those men I had been talking to a short time before that running in all directions, some going north and some going south, and a big crowd of men following them, and then I was not bothered for two or three evenings afterwards. Then they came out again with other men than those they had the first time.

Q. When was this? A. About the 17th day of April that they first started to picket, and after they came back the second time they continued to picket their pickets there every evening, and for a certain length of time the police would arrest them and take

them down to court and they would be fined and be back on the job the night again, the same men.

Q. Who were those men, if you know them? A. One was named J. A. Payne and the other McCullough.

Q. Were they members of the local union, the defendant here? A. Yes, sir.

Q. Union men? A. Yes, sir.

Q. What did they say and do after you saw them, if you did see them before your place of business A. Well, as a general rule they would state that the place was unfair to organized labor, and tell the people not to patronize it. At other times they would say that "The picture machine in this theater is run by a non-union operator; please do not patronize it."

THE COURT: In what tone of voice?

Q. In what tone of voice did they say that? A. Sometimes loud and sometimes not so loud. Just depended on the crowd a great deal.

Q. Your theater starts to operate in the evening, does it? A. About 7:30 o'clock as a rule.

Q. The theater is attended by men, women and children, I presume? A. Yes, sir.

Q. Is there a large per cent of women go? A. About fifty per cent of women and twenty-five per cent children and the rest are men folks.

Q. Do you know what the fact is as to a large number of women going unaccompanied by their husbands? A. Yes, sir; because as a general rule there are a number of people who work at nights and their wives go to the show just to spend the evening.

Q. What was the capacity of this theater of yours? A. Five hundred.

Q. Your picture show fronts on what street? A. Ninth street.

Q. Is it light there? Electric lighted and bright? A. Yes, sir.

Q. Is that place where a good many people go back and forth on the street? I mean pedestrians walking back and forth? A. No, sir; not very many, because it is

not a much traveled street, other than people going to and from the show, as a rule.

Q. It is a residence part of the city, is that the idea? A. Yes, sir; that is it.

Q. Now, these pickets you speak of, these men that walked back and forth, did they just walk back and forth in front of your property? A. Yes, sir. The front of the building is about fifty feet wide and they would go about five or six feet, or something like that, to each side back and forth.

Q. And did they walk together, these two men, or separate, or do you know? A. Sometimes as a rule they would walk right together, one right behind the other.

Q. Did they use this language as they walked back and forth? A. Yes, sir.

Q. When would they start that proceeding? A. As a rule, about 7:45 in the evening.

Q. Was that about the time when the people commenced to come into the theater? A. Yes, sir.

Q. Now, they would say, "Do not patronize this place; it is unfair to union labor," or something of that kind? A. Yes, sir, if I happened to be anywhere near, and if I didn't happen to be around at the front myself they would come up and talk to the cashier or anybody like that, give them peanuts or something like that, but as a rule they made it a practice to walk back and forth to tell the people not to patronize the place.

Q. Were you employing labor at all? A. Not in that particular line of business. The only labor employed is ticket seller and musician.

Q. They were not involved in this controversy at all? A. No, sir.

Q. The musician, was he a union man? A. No, sir.

Q. It was simply the picture machine operator that was being complained of by the union? A. Yes, sir.

Q. Were you employing labor at all in reference to that?

Mr. Aylward: I object to that as repetition. It has been gone over three or four times.

The Court: Objection overruled.

A.    No, sir.

Q.    (By The Court): What effect did this have on your business? A. It injured the business anywhere from two to five dollars a day as a rule. Sundays it would run about five dollars a day.

Mr. Aylward: I move that that be stricken out as an improper statement on the part of the witness.

The Court: Objecion overruled. .

Q.    Was there a reduction in the receipts within and during the picketing? A. Yes, sir.

Q.    How much? A. Anywhere from ten to fifteen dollars a week.

Q.    (By Mr. Boyle): What, if anything, did any of these people say in reference to what they would do in affecting your business, if anything?

Mr. Aylward: I object to that as being too indefinite and uncertain. Give the name of the person.

Q.    What I am trying to get at is this, what did they say they would do to your business? A. They threatened to ruin it or put me out of the business.

Mr. Aylward: I move that be stricken out as a statement of an improper conclusion.

The Court: What did they say?

Q.    What did they say? What were their words? A. This man Herring told me if I did not employ union operators they would put their pickets out there and keep them out there until they had ruined me. Said they would simply break me up in business if I didn't do as they wanted me to do.

Q.    How many times did he say that to you. A. Just once in the conversation when he demanded I pay him the one hundred dollars.

Q.    (By Mr. Aylward) When was that? A. That was last September. That was the date he made the remark and the business agent told me the same thing.

Q. That is, September, 1914? A. 1915, and the business agent told me the same thing at Thirty-ninth and Main street last October.

Q. Who was the business agent? A. William Weston.

Q. Was anybody present when you had these conversations with these two men? A. My wife.

Q. She is the only one? A. Yes, sir.

Q. (By Mr Boyle): What was said, if you recall, the night the picketing was started, if anything along this line as you recall? A. Well, they informed me they had made the Lyric Theater at Seventh and Main street employ one of their men just the day before that, and they had spent five thousand dollars down at court to put in their man and they were willing to spend that amount of money on me if I refused to employ their operator at that time.

Mr. Aylward: I object to that and move that it be stricken out as a statement of an improper conclusion, and in no way connecting these defendants with any statement of that character. I don't know who "they" are. He says "they" did this and "they" did that.

The Court: Motion overruled.

Q. Who was you referring to? A. Mr. McCullough.

Q. (By The Court): Are these parties all members of the same union? A. Yes, sir; Local 170.

Q. (By Mr. Boyle): That is one of the defendants in this case, P. A. McCullough? A. That is not the same McCullough; there are two of them.

The Court: It would expedite matters to know whether or not at the time these parties were operating under an order of the association. Is that admitted or disputed?

Mr. Aylward: You mean the pickets?

The Court: Yes.

Mr. Aylward: Yes, sir; we admit that.

The Court: Operating under the orders of the union?

MR. AYLWARD: Yes, sir.

Q. That is all.

CROSS-EXAMINATION BY MR. AYLWARD.

Q. You didn't mean to leave the impression with the court that these men were fined every morning and the fine left there? That they were convicted and the fine left there? A. What do you mean by left?

Q. You told the court that these men were fined and went back on the line, when you knew fifteen times you appeared before the judge—Judge Latshaw—and they were acquitted? A. Just once I was over there.

Q. You knew they were acquitted? A. Yes, sir; if you mean that was after they had been fined.

Q. Why didn't you tell the court that? How long were you a member of Local 170? A. About three years.

Q. During that time you operated a moving picture machine? A. Yes, sir.

Q. And then the organization got ready to make a contract with the employers along about the first day of August, 1915? A. Yes, sir.

Q. And you were present at all the meetings preceding the one that led up to the making of this contract? A. No, sir.

Q. You were present at most of them? A. Once or twice.

Q. And you did go to the Employers' Association, and divulge certain secrets of your organization, and you did make known the discussion concerning this contract to the Employers' Association, didn't you? A. No, sir.

Q. And that is why you were fined and suspended for one year. A. No, sir.

Q. Now, do you know Captain Anderson, secretary of the Employers' Association? A. Yes, sir.

Q. You have been conferring with the captain some three or four months about these cases? A. Off and on when I happened to meet him.

Q. Did he employ your counsel in this case? A. No, sir.

Q. Didn't he employ Mr. Henry Conrad and Mr. A. L. Cooper in the other case? A. Yes, sir, he did, I believe.

Q. You haven't paid a dollar for lawyers? A. Yes, sir.

Q. Who have you employed? A. I don't know as I have to answer the question.

MR. AYLWARD: I want to show the connection of the Employers' Association with this case, if I can, and I want to show it by this witness. That is the only purpose I have in asking it.

THE COURT: I don't know that that is material, but the interest, of course, which the witness has in the result of the case, whether it is individually or as a member of some other association, may be disclosed.

MR. BOYLE: I am perfectly willing to tell you anything you want to know about it. I have no secret about my connection with the case.

Q. General Boyle was employed by the Employers' Association of this city to prosecute this suit for you? A. Probably so; I do not know.

Q. You didn't employ him? A. I have talked to him along this line.

Q. Didn't Captain Anderson, who sits behind General Boyle, tell you he had employed General Boyle? A. No, sir.

Q. He didn't tell you that? A. No, sir.

Q. You also had Henry Conrad and Senator Cooper in the same case? A. Yes, sir.

Q. Two or three weeks ago? A. Yes, sir.

Q. Since that time General Boyle has been employed? A. Yes, sir.

Q. Do you know who employed General Boyle? A. No, sir.

Q. What interest did you have in the Rex Theater? A. I owned a half interest in the place.

Q. When did you acquire that half interest? A. When we bought it.

Q. When was that? A. That was about the 8th of October, 1915.

Q. At the time you acquired this half interest, as you claim, there was a union moving picture machine operator employed there? A. Yes.

Q. What was his name? A. I can't remember his name.

Q. His name was George Fulton, wasn't it? A. I believe so.

Q. And you discharged him, didn't you? A. Yes, sir.

Q. And employed a non-union operator? A. No, sir.

Q. Did you employ any operator? A. No, sir.

Q. Who operated the machine? A. I did, myself.

Q. Then when you acquired an interest, as you claim, in the Eastern Theater, about the first of January, 1916, there was a union operator employed there? A. Yes, sir.

Q. You discharged him? A. No, sir.

Q. Who did discharge him? A. Mr. Briner.

Q. At your direction? A. No, sir.

Q. And you knew he was to be discharged? A. I knew he had been given a notice.

Q. Then you employed a man by the man of Brown to operate this machine, who was a non-union man? A. No, sir.

Q. Did Mr. Brown operate the machine? A. He was in the booth, but he didn't operate the machine. He was a student.

Q. At no time? A. He was a student.

Q. Didn't you tell these defendants that Mr. Brown was operating the machine? A. No, sir.

Q. Didn't you tell Mr. Shetler, the man you discharged, that you had employed Mr. Brown to take his place. A. No, sir.

Q. Don't you know as a matter of fact Brown was an experienced machine operator for some time prior to this? A. No, sir.

Q. You have told these defendants, McCullough and Weston and Herring and Cessna and Payne, that Briner didn't have any interest in this theater? A. No, sir.

Q. And that you had given Briner an interest in the theater for the purpose of avoiding the necessity, as you claimed, of employing a union man? A. No, sir.

Q. And you have threatened them from time to time of breaking up their union, haven't you? A. No, sir.

Q. These defendants? A. No, sir.

Q. Didn't you tell them you were going to tear up the little nest of operators, that they had only about five hundred dollars left in the treasury and it wouldn't last long? A. No, sir; I didn't know how much they had.

Q. That you were closely associated with the Employer's Association and you were going to do that? A. No, sir.

Q. Did you say it didn't require any skill to operate a moving picture machine? A. It requires skill? No, sir; most any man of ordinary intelligence can do it in about a week's time.

Q. How long did it take Brown? A. About two weeks.

Q. It took him longer than it would an ordinary man? A. He was not there all the time. He was there some evenings and some evenings he didn't come.

Q. Who owned the Rex Theater when you went in there? A. A lady by the name of Miss McQueeny.

Q. Did you buy your interest from Miss McQueeny? A. Yes, sir.

Q. About what time? A. About the 8th of October, 1915.

Q. Where does she live? A. I don't know where she lives now.

Q.   Is she still in town? A.   I don't know.

Q.   Was there a man named Wilson interested in the theater out there? A.   No, sir.

Q.   I believe you said there wasn't anybody else present when you had these alleged conversations with Mr. Herring and Cessna and Weston— A.   (Interrupting) I didn't speak of Mr. Cessna in particular.

Q.   Just a minute until I finish.   Payne and Frank Cawood, except your wife? A.   No, sir, I didn't make that statement.

Q.   What was your statement in reference to that? When was your wife present? A.   She was present during the conversation I had with the business agent at the time I was located at Thirty-ninth and Main, and she was also present at the time I had the conversation with Mr. Herring in regard to the Fifteenth street show when I was talking to him on Twelfth street.

Q.   Then she was only present twice?   That is, in the conversation with Herring and the conversation with Weston? A.   Yes, sir.

Q.   And no one else? A.   No, sir.

Q.   Now, you have prosecuted these men from time to time? A. No, sir.

Q.   Didn't you appear in police court fourteen or fifteen times? A. Yes, sir.

Q.   All those cases were appealed to the criminal court of this city? A.   Yes sir.

Q.   And Judge Latshaw, discharged and acquitted these defendants that were so charged in police court? A.   Yes, sir; I believe he did.

Q.   And you testified, and your wife and everybody else in your employ out there? A.   No, sir; not everybody.

Q.   Didn't you testify in the police court that Briner had no interest in this theater at all? A. No, sir.

Q.   That you were the sole proprietor? A   No, sir.

Q.   And didn't you tell these defendants that? A.   No, sir.

Q. Now, of course, you knew that as a member of the Moving Picture Machine Operator's Association, that under their custom and practice, or in their contracts with the employers, that it was generally understood and agreed that no employer or owner or proprietor of any theater should operate a moving picture machine himself, because if that was permitted he would thereby be enabled to break down the standard scale of wages and regulate labor conditions and hours to suit himself? You knew that, didn't you? A. I knew that existed to some extent, but I told the business agent I didn't see why—

Q. (Interrupting) You knew that was the purpose—

MR. BOYLE (interrupting): Let him finish.

A. I told the business agent I did not see why a man did not have a right to run his own business where he had his money tied up and paid city licenses amounting to a hundred dollars a year.

Q. I want an answer to my question. He is not answering my question.

MR. BOYLE: I think he is.

A. The city occupation license costs us one hundred dollars a year, and when the proprietor paid that, together with fifty dollars a year war tax, I thought he ought to have a right to step into the picture machine booth and operate the machine if he felt like it.

MR. AYLWARD: I move the answer be stricken out as an improper conclusion and statement of witness, and move that witness be required to answer my question.

THE COURT: Motion overruled.

Q. You knew that the object of these journeymen operators, these men employed in operating picture machines, in objecting to employers or owners operating their own machines, was the fact there was great danger, and it was discussed while you were a member of the organization, of the employers breaking down the standard scale and living scale of wages as existing the country over, and thereby regulating as he saw fit himself

the hours and conditions of labor, didn't you? A. Yes, sir, and they had said anybody who attempted to run his own machine, under those conditions, they would try to put out of business as fast as they could.

Q. Who said that to you? A. Members of the executive board.

Q. Who were the members of the executive board that said that? A. William Weston.

Q. Who else? A. Mr. Cawood, Mr. McCullough—

Q. (Interrupting): What McCullough is that? A. I don't know. It is not the picket; it is the other one.

Q Who else? A. Frank Cessna.

Q Anyone else? A. No, sir.

Q. You have gone about from one theater to the other, trying to get the proprietors and owners of the moving picture shows to discharge union men, from time to time, haven't you? A. No, sir.

Q. Do you mean to say you did not go to any other theater and attempt that? A. No, sir.

Q. And you have threatened these defendants? A. In what way have I threatened them?

Q. You have threatened them by saying you were going to destroy their organization, haven't you? A. No, sir.

Q. That is, in connection with the Employers' Association? A. No, sir.

Q. And with their much power and influence you were going to disrupt and destroy this organization? A. No, sir.

Q. Didn't you tell them the Employers' Association had money and was of much power and influence in the community? A. No, sir.

Q. And would destroy their organization? A. No, sir. All I asked them to do was leave me alone and let me operate my own place of business that I had my money tied up in.

Q. That is all.

RE-DIRECT EXAMINATION BY MR. BOYLE.

Q. By the way, you spoke now of having your money tied up. Are you a man of any special means? A. Just moderate.

MR. AYLWARD: Objected to as immaterial.

Q. Mr. Aylward has asked you here about the Criminal Court. What was it Judge Latshaw said when he discharged these men?

MR. AYLWARD: I object to what Judge Latshaw said, because the record is the best evidence as to whether or not this man was convicted.

MR. BOYLE: I don't think any of it is competent as far as that is concerned.

THE COURT: Objection sustained.

To which ruling and action of the court the plaintiffs then and there at the time duly excepted and still except.

Q. Speaking about criminal courts and arrests, were any of these people arrested on account of assaulting anybody down there?

MR. AYLWARD: I object to that, as the record is the best evidence.

THE COURT: Objection overruled.

A. Yes, sir.

Q. Where is that case pending? A. In Judge Welsh's court.

Q. Still pending? A. It is to be tried tomorrow.

Q. That was an assault on the part of one of these pickets against your wife, was it? A. Yes, sir.

MR. AYLWARD (Interrupting): Objected to as leading and suggestive, and he ought to permit the witness to testify in his own case.

Q. (By THE COURT): Did you see the assault? A. No, sir.

MR. AYLWARD: I move that the answer be stricken out, and all his information concerning any assault and unconsciousness on the part of his wife be stricken out.

THE COURT: Motion sustained.

To which ruling and action of the court the plaintiffs then and there at the time duly excepted and still except.

Q. (By Mr. Aylward): Do you know whether or not a proceeding is pending?

The Court: I don't think that is important. This record ought to show the facts, not that somebody has been arrested. He may not be guilty.

Q. That is true. This man Brown that has been spoken of here, did you pay Brown any money for working at your place? A. No, sir; Brown paid me the sum of ten dollars to teach him to run a picture machine.

Q. Do you know where Mr. Brown is now? A. No, sir.

Q. Have you tried to get hold of Brown to get him here? A. Yes, sir.

Q. You have his wife here? A. Yes, sir.

Q. He was not employed by you, but hired you to teach him how to run a picture machine? A. Yes, sir, because the union wouldn't take on any students, as he understood, at that time, and he wanted to learn to operate a picture machine.

Q. And paid you ten dollars for that purpose? A. Yes, sir.

Q. Did you ever employ a union or non-union man, or anybody in reference to the operation of your machine, directly or indirectly? A. Yes, sir.

Q. When was that? A. That was when I first went in business. The first month I was in business I held the job myself at a show located at Ninth and Troost, and during that month's time I employed a union operator out where my wife was with this place.

Q. What was that? A. That place was known as the Starlight Theater.

Q. That was a theater in which you had an interest? A. Myself and my wife.

Q. You hired a union man there? A. Yes, sir.

Q. And worked at another place? A. Yes sir.

Q. And·that is what they wanted you to do with reference to this particular matter that is now involved? A. Yes, sir.

Q. And which you refused to do? A. I refused because my wife was not capable of taking care of the place by herself and I could not afford to hire a man and pay him the salary of $17 a week and not do anything myself. The business didn't justify the paying of that amount of money.

Q. So that if you had to do one of two things, as I understand you—

MR. AYLWARD (interrupting): I think that is argumentative.

Q. You say you were not able to employ a union operator and stay there yourself. What do you mean by that? A. That is, by me staying around on the floor and not drawing anything other than just my share of the profits, and paying a man for doing the work that I was capable of doing myself, and that they would allow me to do if I was in good standing, by working at some other place.

Q. That is all.

RE-CROSS-EXAMINATION BY MR. AYLWARD.

Q. They had been offering to have you employed, or they would see you had employment at some other place of some sort, and your wife could run the place? A. She was. I told the business agent I was willing to pay the dues and assessments necessary if he would let me operate my own business.

Q. Who was it you told that to? A. The business agent.

Q. Who was that? A. Mr. Weston.

Q. How much did Brown pay you for teaching him to run the machine? A. The sum of ten dollars.

Q. You knew before any reputable theater of any standing in this community would employ an operator he must have had two years' experience? A. I know some of the members in that organization that did not have two years' experience.

Q. You know that that is a fact, don't you? A. It is supposed to be, but it does not always exist.

Q. You know your wife walked up and down the sidewalk with the picket, arm in arm— A. (Interrupting.): Once in a while.

Q. She would take hold of them and walk up and down with them and say, "This theater is fair, patronize it"? A. She did that on the ground that Judge Latshaw said this was a country of free speech, and if they had a right to say it was unfair, she felt she had a right to tell the people it was not unfair to organized labor, because we were not.

Q. You saw her take a young baby and put it on Payne's shoulder? A. No, sir.

Q. And you saw her take the tickets and roll them in a ball and throw them at the boys as they passed by there attending to their own business? A. No, sir.

Q. Did you see her take two buggies and put them across the sidewalk so that nobody could go by? A. No, sir. That would injure the business.

Q. You would say you did not see that? A. No, sir.

Q. Did you see her roll a baby buggy up to the curbstone so as to prevent pedestrians from passing by? A. No, sir.

Q. Did you see her hand in hand with women on the sidewalk so as to obstruct the same? A. No, sir.

Q. Didn't you hang a sign on your cashier, "Today Only," and walk her up the street so as to attract attention? A. I put the sign on her.

Q. Did you walk her up the street a hundred feet? A Yes, sir.

Q. Did you put on her back, "Admission five cents this day only"? A. Yes, sir. That had nothing to do with the pickets.

Q. Didn't you take the ticket box out to the edge of the curbstone so that your wife would have to walk from the entrance of the entrance, some fifteen or twenty feet away, to deposit tickets, so as to obstruct the side-

walk? A. I understand she tore up the tickets and threw them at the picket's face, from what you said. I don't know where she put the box.

Q. Do you know whether she threw any tickets in the picket's face or not? A. No, sir.

Q. You saw her walking lock-step with these pickets? A. What is that?

Q. You didn't see that? A. No, sir.

Q. You saw her going up and down the street with them from time to time with her arm on their shoulder, before your theater? A. She walked up and down the street whenever she wanted to.

Q. That occurred time after time? A. She walked up and down the street several times.'

Q. With her arm on the picket's shoulder? A. I can't say that part.

Q. Did you ever see that at any time? A. No, sir.

Q. You never saw that at any time? A. No, sir, but I saw her hit one of them when he insulted her.

Q. You saw her knock this boy clear in the street? A. When he asked her to have a cigarette.

Q. Nobody has prosecuted her?

MR. BOYLE: What was you saying about a cigarette? A. One evening she happened to be in front and one of the men asked if she wouldn't have a cigarette. She told him she didn't smoke, and she, of course, knew him and was very mad and she hit him "slam" in the face.

Q. One of these pickets? A. Yes, sir.

Q. What picket is that? A. McCullough.

Q. Hit him in the face and knocked him in the street? A. No, sir.

Q. You mean to say she didn't knock him down? A. No, sir.

Q. Payne or McCullough, who have been picketing since April 17th, have never been arrested for any assault? A. No, sir. They have been arrested, but not for assault.

Q. For any assault, that is what I said. And haven't you told Payne and McCullough as they walked

by there, and the neighbors out there, the members of this executive board and these other defendants, and Miss Nellie Johnson, Cornelia Roop, Mrs. Fulton, Cora Turner, William Weston, J. A. Payne, Paul McCullough, Emmett Lee Malicoat, William C. Schutt, J. L. Herring, Ethel Neff, J. M. Edmonds, King Mansfield, Miss Edith Fitzpatrick and Jas. G. Havenner and Bart Henderson, that these pickets were not in any way interfering with your business, and had not injured it in any way, and that your business had been increased thereby? A. No, sir.

Q. You didn't make that statement during any of this time? A. No, sir.

Q. That is all.

Witness excused.

Mrs. C. R. Miller, called as a witness on the part of the plaintiffs, having been first duly sworn, testified as follows, to-wit:

### Direct Examination by Mr. Boyle.

Q. Please state your name to the court. A. Mrs. C. R. Miller.

Q. Where do you live with reference to where this theater is located? A. Well, I am about three blocks west and one north.

Q. And what does your family consist of? A. I have two sons thirteen and fifteen years old, and my husband.

Q. They both live at your house? A. Yes, sir.

Q. What is your husband's business? A. He is conductor for the Metropolitan.

Q. Did you at any time make a practice of attending this little picture show that is in question here by yourself and with your family or otherwise? A. Yes, sir, I went quite often.

Q. In the evening would you go? A. Yes, sir.

Q. Would your husband be with you? A. No, sir.

Q. Or any of your children?

Mr. Aylward: I think that is immaterial.

The Court: Objection overruled.

A.   Yes, sir.

Q.   Have you a recollection about when this picketing started?  A.   Well, it was some time in April, as near as I can remember.

Q.   Well, what is the fact as to your attending the theater thereafter?  A.   Well, I just quit going.

Q.   Why?

MR. AYLWARD: Objected to as calling for an improper conclusion on the part of the witness.

THE COURT: Objection overruled.

A.   I quit going because my husband said we should not go down there any more—

MR AYLWARD (interrupting): I move that that be stricken out as being wholly immaterial and in no way any cause for issuing a temporary restraining order or enforcing it, either.

THE COURT: Motion overruled.

A.   He said he thought it would be—we would be in danger.

MR. AYLWARD: Object to what he said and move that it be stricken out.

THE COURT: Motion overruled.

A.   That he was afraid that the place might be blown up by these pickets.  He thought it was dangerous for me to go down there and take the children.

MR. AYLWARD: I move that that answer be stricken out as purely hearsay, a statement made by her husband, and said for the purpose of attempting to prejudice these defendants in the mind of this court.

THE COURT: Motion overruled.

Q.   Did you go thereafter?  A.   I went once about two weeks ago when they had it in the airdome, and while I was there there was a very pungent odor of some kind.  I don't know why it was put there but it was very pungent and I had to get up and leave.

MR. AYLWARD: I move that that be stricken out as in no way binding on the defendants, and showing her interest and prejudice and said for the purpose of prejudic-

ing the defendants in the mind of the court, no connection with the defendants having been made.

THE COURT: Motion overruled.

Q. Was there any reason, other than this picketing labor trouble, that prevented you going to the theater?

MR. AYLWARD: Objected to as calling for an improper conclusion on the part of the witness and being leading and suggestive.

THE COURT: Objection overruled.

A. No, sir, there was not.

Q. You may take the witness.

CROSS-EXAMINATION BY MR AYLWARD.

Q. You made an affidavit on the 23d of June, 1916, didn't you? A. Yes, sir.

Q. And in that affidavit you did not say anything about any odor? A. Well, that happened since that.

Q. That happened since then? A. Yes, sir.

Q. When did this happen? A. About two weeks ago, as near as I can remember.

Q. The pickets were not there then, were they? A. No, sir, they were not. I did not say they were either.

Q. There wasn't any picketing going on at all. That is all.

Witness excused.

MISS LOLA M. DONOVAN, called as a witness on the part of the plaintiffs, having been first duly sworn, testified as follows, to-wit:

DIRECT EXAMINATION BY MR. BOYLE.

Q. What is your full name, please? A. Lola M. Donovan.

Q. Were you concerned in the little moving picture theater that is in question? A. I am.

Q. Were you during the time of this picketing? A. Yes, sir.

Q. You took the money, did you, from night to night? A. Yes, sir.

Q. Were you there prior to the time the picketing started? A. I have been there since last September.

Q. And you were there during the period of picketing? A. Yes, sir.

Q. Now, what is the fact as to whether or not the attendance fell off after the picketing started?

MR. AYLWARD: Objected to as calling for an improper conclusion on the part of the witness and being leading and suggestive.

THE COURT: Objection overruled.

A. It certainly did.

Q. Your place in the ticket office was that right in front? A. To one side.

Q. You had a command or view of the street did you? A. Yes, sir.

Q. And just tell the court now what was done there from night to night by these pickets. A. Well, they started on the first night of the 17th to walk up and down there three or four times before the picket hit Mrs. Hughes.

Q. Before what? A. Before Mr. Randall hit Mrs. Hughes.

MR. AYLWARD: I move that that be stricken out as being highly improper, about what Mr. Randall did.

Q. What is Mr. Randall? A. That is the picket that hit Mrs. Hughes—the first picket.

MR. AYLWARD: I object to that as being solely for the purpose of prejudicing the defendants in the mind of the court, and being immaterial.

Q. (By THE COURT): Did you see the picket hit her? A. Yes, sir, I did.

Q. When did this occur? A. The 17th of April.

Q. That you claim Mr. Randall hit Mrs. Hughes? A. Yes, sir.

THE COURT: Objection overruled.

Q. (By Mr. Boyle): What was the other man's name, this picket that worked with Mr. Randall? A. I could not tell you.

Q. Did those two men continue picketing thereafter, or were the pickets changed? A. I don't remember what the other fellow looked like, I didn't know him.

Q. Did Mr. Randall return any more? A. No, sir, he didn't. He sure didn't.

Q. Mr. Randall, after the first night, he didn't come back? A. No, sir.

Q. Then thereafter what did the pickets do, after this first night? A. Well, they came back in four or five nights, I don't remember just now, but in a short time after Mr. Randall hit Mrs. Hughes, and walked up and down there and said, "This theater is unfair to organized labor, please do not patronize it."

Q. The labor difficulty was over the operator of the machine? A. Yes, sir.

Q. And didn't apply to your position or any other position? A. No, sir.

Q. That is all.

CROSS-EXAMINATION BY MR. AYLWARD.

Q. You are still working for Mr. Hughes? A. Yes, sir.

Q. Did you testify in the other case against the pickets? A. I certainly did.

Q. Some fourteen or fifteen times? A. Yes, sir.

Q. Did you testify in the criminal court? A. No, sir.

Q. You were not there? A. I was there, but they didn't call on me.

Q. Did you see Mrs. Hughes walk up and down the sidewalk in front of the theater with her hand on one or the other of the pickets? A. I did not.

Q. You didn't observe that? A. I did not.

Q. Did you see her take two baby buggies and set them across the sidewalk so as to keep people from passing up and down? A. No, sir.

Q. You didn't see that? A. No, sir.

Q. Did you see her take the tickets that were taken there, that you sold, and roll them in a ball and throw them at the pickets as they went by? A. She might have done that once or twice.

Q. Did you see her take a baby buggy and run it to the curbstone and put it partly on the parking and partly on the curbstone so as to make the pickets walk in the street? A. I did not. They didn't walk in the street at any time.

Q. I didn't ask you that, did I? A. No, sir.

Q. Did you hear Mr. Hughes make statements to the pickets out there, when they were not saying anything back to him or had not provoked him to make any statement, that he was going to disorganize Local 170 of the Moving Picture Operators? A. No, sir, I did not.

Q. Didn't you hear him tell them he was doing a thriving business, a flourishing business, and they were not affecting him in any way? A. I did not.

Q. Did you see Mrs. Hughes with a knife with a disappearing blade, thrusting it at the pickets as they went by? A. It was not a knife, it was a little piece of tin.

Q. She did thrust it towards the pickets as they walked up and down? A. Yes, sir.

Q. And she did threaten them from time to time? A. No, sir.

Q. Didn't you hear Mr. Hughes say he was going to have his wife knock their heads off if they didn't get away from there? A. No, sir.

Q. Did you see him go after a gun one night and threaten the pickets? A. I have a gun always in the booth with me.

Q. Didn't he put his hand on the gun and lay his arm across the window and say to Payne and McCullough that they had better be careful or he was going to blow them up? A He did not say that.

Q. What did he say? A. He did not say anything that I heard. He had his hand at the window, laying on the window rest.

Q. And he was apparently in position where he was going to take a shot at somebody? A. He could not get the gun from where I had it.

Q. I say, he was in that position—it appeared that way from the outside? A. Well, it might have looked so to them.

Q. Did you see Mr. Hughes pin this placard—was it on you or on the piano player? A. I could not see inside and outside, too.

Q. I know, but she started down the street. A. I was inside.

Q. I want to know whether it was you or one of the other ladies. A. I was inside. It was the piano player.

Q. He pinned a sign her, "Today, admission five cents only"? A. Just says, "Today." That had nothing to do with the pickets.

Q Mr. Hughes went up the street seventy-five feet away and called her when there were a great many persons out there, coming in and going out of the show? A. Just four or five, and they were connected with the show. Mrs. Fleming and Mrs. Hughes and two other ladies.

Q. Did you see her take the ticket box out to the edge of the sidewalk and put it on the curb so that she would have to walk from your window, where the tickets were sold, across to the curb in order to deposit them in the box? A. No, sir.

Q. You never saw that at any time? A. No, sir.

Q. How often were you there? A. Every night.

Q. Did you sell tickets out on the curbstone? A. I should say not.

Q. At any time? A. No, sir.

Q. Did you put any tickets in the box on the curbsont? A. I did not.

Q. Did you see Mrs. Hughes put a baby on the picket's arm or shoulder as he walked up and down? A. No, sir.

Q. You never saw that at any time? A. No, sir.

Q. Did you see her clasp hands with a number of women and stand across the sidewalk so that nobody could get by? A. No, sir.

Q. You never observed that? A. No, sir.

Q.  Did you see her wrestle with the boys on the sidewalk.  A.  No, sir.

Q.  Did you see Mr. Hughes playing leapfrog with the boys on the sidewalk?  A.  No, sir.

Q.  Did you see the boys playing leapfrog on the sidewalk?  A.  No, sir.

Q.  That is all.

Witness excused.

ELIJAH SUMMERS, called as a witness on the part of the plaintiffs, having been first duly sworn, testified as follows, to-wit:

### DIRECT EXAMINATION BY MR. BOYLE.

Q.  Please state your name to the court.  A.  Elijah Summers.

Q.  Do you live out in the neighborhood of where this theater is located that is in question here?  A.  Yes, sir.

Q.  Do you and your children at times go to that theater?  A.  Yes, sir.

Q.  I will ask you just one matter.  Do you recall of any circumstance where you took any of your people out of the theater any time?  A.  One Sunday evening I was up there and took the little boy out.

Q.  Why did you take him out?  A.  Because the way they were acting I was afraid there would be trouble up there.

MR. AYLWARD:  I object to that as immaterial, because no showing that these defendants had anything to do with it.

THE COURT:  Overruled.

Q.  Was it on account of this labor situation?

MR. AYLWARD:  Objected to as leading and suggestive.

Q.  (By THE COURT):  He has answered.  You didn't state why you were afraid there would be a disturbance?  A.  No, sir.

Q.  Why were you afraid there would be a disturbance?  A.  Why, the way they were acting out in front.

Q. Who? A. I don't know. Fifteen or twenty out there.

Q. What were they doing? A. Some walking up and down the street and some stood on the corner and some on the other corner.

Q. What were they saying? A. I could not understand what they were saying.

Q. You don't know what their business was there? A. Well, in fact, no sir, I don't know what their business was there.

Q. You don't kno wwho they were? A. I don't know none of them.

Q. (By MR. BOYLE): What did they appear to be doing? A. Well, there was two walking up and down in front of the theater and three or four standing on the northeast corner, and we were going up to my father's and we just stepped in there and got the kid out. We thought maybe there would be some kind of riot or fight take place and I didn't want him up there.

MR. AYLWARD: I move that that be stricken out as being purely a conclusion.

THE COURT: Motion overruled.

Q. What time was that? A. It was on Sunday evening.

Q. What month was it in? A. I didn't pay no particular to the date or anything, I know it was on Sunday evening.

Q. It was here during this spring. A. Oh, yes: during the time they were picketing out there.

Q. That is all.

CROSS-EXAMINATION BY MR. AYLWARD.

Q. You don't know who the men were standing on the corner. A. No, sir.

Q. You never saw them before? A. I had saw two of them before that were picketing.

Q. That was some hundred feet away from the place where you saw them standing on the corner? A. It might be of the ticket window.

Q. Did you see Mrs. Hughes walk up and down the sidewalk with her hand on the picket's shoulder? A. No, sir.

Q. You didn't go to the picture show yourself? A. No, sir.

Q. Has Mr. Hughes given you any free passes since this occurrence? A. No, sir.

Q. Has he given the boy any? A. No, sir.

Q. Or any other witness? A. No, sir; not as I know of.

Q. That is all.

Witness excused.

MR. BOYLE: I presume this International Alliance Theatrical Stage Employees' company or organization, that is the national?

MR. AYLWARD: I don't know anything about it. I am here representing this local. Of course, I am going to claim that the court would have no right under any circumstances to enjoin a voluntary association, when the time comes.

MR. BOYLE: Is there any question about this local being a member of the International Alliance?

MR. AYLWARD: I don't know about that.

GROVER CHILDERS, called as a witness on the part of the plaintiffs, having been first duly sworn, testified as follows, to-wit:

DIRECT EXAMINATION BY MR. BOYLE.

Q. What is your name, please? A. Grover Childers.

Q. Are you connected with Local 170, Kansas City Motion Picture Machine Operators? A. I am.

Q. In what capacity. A. I am vice-president at the present time.

Q. You have been sitting here with Mr. Aylward as one of his advisers in reference to this lawsuit? A. No, sir.

Q. You have been sitting by him here in the court room? A. I have taken no position except in that chair.

Q. The point is, I am not acquainted with you, I just simply picked you out of the court room and put you on the witness stand. I want to ask you if you know what relation the Kansas City Motion Picture Machine Operators' Association, Local No. 170, has to the International Alliance, Theatrical Stage Employees? A. I don't know that. I know there is some relation, but as to what it is I don't know. My understanding of it is as a member, and I think I understand their theory, that the International has no binding power on this local. It has no binding power on it, on the organizations or associations of the various states. They are associated together and it is a voluntary association, one state with another. It is a voluntary association, one man out of each organization, but I know of no binding rule that would give the International power to compel this local to do any certain thing.

Q. In other words, all the state associations in their united capacity make up the International? A. Such delegates as they might send there would be the International. They hold an international convention; that is where the word "international" comes in. They hold international conventions, and these conventions take up working conditions and matters generally and they discuss it, etc. I have attended those conventions.

Q. This local is a member of the state organization? A. There are several organizations over the state and we have delegates that meet with different organizations, etc., and things of that kind.

Q. In state convention? A. No, sir; we have never held a state convention in the state. There is no state convention in this state at all. Never has been one held.

Q. That is all.

CROSS-EXAMINATION BY MR. AYLWARD.

Q. You are a practicing lawyer? A. Yes, sir.

Q. Practice at this bar? A. Yes, sir.

Q. How long have you been a member of Local No. 170? A. I joined in 1912.

Q.  You have been out near this theater?  A.  I have.

Q.  During the time picketing was going on?  A.  I have.

Q.  I wish you would tell the court how the pickets conducted and demeaned themselves at that time.  A. The pickets have at all times worked quietly. They have never under my observation, and it was—I have made it particularly my duty to observe—they have never spoken about the voice of (indicating: "This theater is unfair to organized labor; please do not patronize it."

Q.  And in what tone?  A.  About that tone.

Q.  Just in an ordinary, low, mild-mannered tone? A.  Just a conversational tone.

Q.  What has been their manner towards patrons and members of the public?  A.  They always avoided those because they knew—

Mr. Boyle (interrupting): I object to that.

A.  You are right about it.  They have worked with the idea in view that there was an unfriendly attitude there and they were avoiding the pedestrians at all times.

Q.  How many times did you say you had occasion to observe the conduct and demeanor of the pickets?  A. I think it was three or four times I was there.

Q.  Why did you go there?  A.  Well, I was attorney representing them in the North Side Court, and I considered it my duty to see that they remained within the law, and I was there to observe that they were not breaking the law, that they were peaceable and quiet, and that they didn't loiter or molest anyone, and I was there for that purpose.

Q.  Did you ever see them interfere with any person intending to go into or coming out of the place, patrons of the place?  A.  They never interfered with anyone in my observation.

Q.  Did they obstruct the sidewalk?  A.  They walked in single file and outside of the sidewalk there.

Q.  They never walked down two abreast?  A.  They never walked down two abreast under my observation.

Q. Were they always quiet, decent and orderly in their appearance and manner? A. They were.

Q. Did you ever hear them threaten, intimidate or attempt to coerce any person to keep them from going in and out of the theater? A. They didn't under my observation. I made it my business to observe that they didn't, and under my instructions as their attorney they were not to.

Q. Did they ever create any disturbance in your presence? A. They did not.

Q. What was the attitude of your organization towards violence and disturbances? A. Our organization has always stood opposed to violence of any kind. I served as its president for two years and as president I had power that was strong with the boys and I always stood emphatic that there should be no breach of the peace or disturbance or anything of that kind, and instructed the boys to live strictly to that and I have never known of any exceptions to that.

Q. Was the sidewalk always free? A. Yes, sir.

Q. And the entrance to the theater free? A. Yes, sir.

Q. Did you observe customers and patrons going in and out at that time? A. I did.

Q. Did they appear to be doing a fair business? A I noticed no difference in the business from seeing the people come out at any time I was there. I was there along towards the first they were there and I was there later on. The last night I was there when the first show was over and it seemed to me the same crowd walked out, practically, as the first time I was there.

Q. About what kind of a crowd would you say? Was it well filled; could you tell from the number in the crowd? A. Yes, sir; there was a good crowd came out of there.

Q. You have had some conversation with Mr. Hughes concerning his business out there? A. Yes, sir.

Q. What did he say to you with reference to his business there, the condition of it? A. I have heard

him state frequently the operators were not bothering him any.

Q. Did you ever hear him state they were not injuring his business? A. Yes, sir. I don't know that he used those words. The words I have always heard him use was, "They don't bother me any out there." I have heard expressions to that effect.

Q. What did he say with reference to his business, as to the picketing having any effect on it? A. That is what I stated that the operators didn't bother him in his business any. That they didn't bother him any. I was at his theater in two weeks, probably, after the picketing started to working there, and Mr. and Mrs. Hughes and I had several friendly conversation during that evening. I always considered myself somewhat friendly with Mr. and Mrs. Hughes, and personally I never was inimical to them during that time, and conversed that evening. They remarked that evening to me, "The operators are not hurting us any," and a big crowd came out of the theater.

Q. You mean the pickets; you used the word "operators"? A. Yes, sir.

Q. Have you observed the conduct of Mrs. Hughes towards the pickets or other persons at those times? A. Not on that evening. That was the only evening I went in front of the theater while I was there. Prior to that I was there and stood down the street a half a block or something like that, and at that time I saw her molest the pickets.

Q. What was she doing? A. I saw her throw some tickets at them on one occasion, and I saw her lock hands across the sidewalk and the pickets had to get off the side-sidewalk. I saw her and another woman lock hands across the sidewalk and the pickets had to get off the sidewalk and walk out in the street and come back on the sidewalk to continue their journey.

Q. Did the pickets interfere with the women at that time? A. They did not.

Q. They walked out in the street? A. Yes, sir.

Q. To avoid them? A. They did.

Q. Do any of your organization ever congregate out there in numbers, or anything of that kind? A. No, sir; they were instructed by me not to. I told them not to go out there. I told the boys to stay away from there.

Q. Only two pickets out on the job? A. Only two pickets on the job and I always had a man on the job to tell me if they were arrested, to get bond and get others to go out there.

Q. Did Mrs. Hughes, when she joined hands with this other woman, blockade the sidewalk? A. Yes, sir, she did.

Q. And kept other pedestrians from going by? A. They had to walk around them.

Q. Did these pickets address their remarks to anybody in particular? .A. They did not, and I instructed them not to.

Q. The appeal was to the general public? A. Yes, sir.

Q. And if they were not interested, nothing was said? A. No, sir.

Q. You never attempted to force your statements upon anybody that didn't want to accept it? A. They addressed no one in person, only the general remark to the public.

Q. Did these pickets keep moving all the time? A. Yes, sir.

Q. Did they ever stop to converse with anybody on the job? A. No, sir.

Q. Or stand in front of the theater at any time? A. They did not.

Q. You heard Mr. Hughes testify as to his relations with your orgazination, this morning? A. I have.

Q. Did you have any conversation with him in reference to that matter? A. His relations with the organization?

Q. Yes, sir. A. Well, I was president for two years while he was a member.

Q. I wish you would tell the court what the situation was. A. The operators, when I joined them, if I remem-

ber correctly, Mr. Hughes was a member in 1912, and he was a member in good standing on down until about last fall two years ago, or something like that. He acquired an interest or acquire a theatre at Seventeenth and Lister, that is the first I knew of him as being an exhibitor, and at that time the Exhibitors' Association made us trouble, and discussed with us the right of Mr Hughes to operate his own machine. At that time we made no complaint to the exhibitor's liberty of any member operating his own machine, but in that fall we had three men that got partners. They called them partners. They took in partners, they claimed. Then one of the partners wanted to become a member of our organization. We told them we took in no members that were exhibitors. The next day he came down and said he was not a partner, he had sold out. I told him we would take his application and put it up to ballot. The next week he came down and said, "I guess you fellows are not going to do anything, I am going back in; I have taken an interest again." He switched back and forth as a partner within three weeks, and at that time we conceived it would be impossible to maintain our organization to take and allow members to operate their own machines, because the operators became partners and was operating his own machine. Since that time we have ruled no member of our organization can be an exhibitor or that an exhibitor can operate his own machine and be fair to the operators.

Q. Who were the exhibitors, the employers? A. Yes, sir, the men that run the show.

Q. Your organization don't take in employers? A. No, sir.

Q. The only persons eligible for membership are employees? A. Yes, sir.

Q. The man who operates the machine for the employer? A. Yes, sir. The men at the Summit Theater, I can't recall their names right now—one or two men that run the Seventeenth and Summit theater came up to me and said, "Hughes is operating a show at Seventeenth and Lister and we have as much right to operate as he

has.'' I told them that he was a member of our organization and his relations with us was our own business, and we would have no discussion with him concerning that.

Q. Did you have contracts with the exhibitors' league for their employment of members of your organization? A. Our contracts are individual contracts, and we had contracts with the different exhibitors of the city.

Q. Were they members of the exhibitors' league? A. Yes, sir.

Q. Have you at any time entered into any agreement to injure the business of these plaintiffs, Hughes and Briner? A. No, sir, I have not.

Q. Were they ever discussed in any way, shape or form with reference to injuring or damaging their business? A. We have not.

Q. What is the attitude of your organization in that matter? A. Well, at that time then in September—

Q. (Interrupting): What I want to know is, have you always been opposed to violence and damage to property and the destruction of property? A. We have.

Q. Did you ever tell him you were going to destroy his property? A. No, sir.

Q. Or did anybody have any authority for or on behalf of your organization to make any such statement, if it was made? A. The organization would fine any man or deal with him harshly or expel him if he made such remark. If he did, he would be censured and punished by the organization as far as our rules would permit.

Q. Did you know anything about Mr. Hughes going from one theater to another seeking the discharge of union employees? A. I have known that for almost a year.

Q. What theaters has he gone to?

MR. BOYLE: Of course, you have a lawyer on the stand and he knows he ought not to tell what somebody told him.

Q. I don't want him to tell that, but I assume I have a right to show any conversation he might have had with

Mr. Hughes, or any information he might have acquired in that manner.

MR. BOYLE: Sure.

Q. All right. A. When I was in the president's chair last fall when he first—possibly it was the first of this year, when he first took charge of this theater out here, at this time he owed the organization for dues and I called the attention of the organization to the fact that he was three months in arrears. It is a rule of the organization that a man three months in arrears shall be suspended. I called attention that he was three months in arrears. As president I had authority at that time to declare him suspended from the organization, and I said, "Now, brothers, I hate to declare the man suspended. I am going to leave it to the organization. What shall we do in the matter?" And somebody made a motion we hear from Brother Hughes, and Brother Hughes got up at the time and says, "I know I am in arrears. I didn't know I stood like this, but it don't make much difference. If I would go downstairs I could get the money, but I am just going to let it go; it don't make any difference whether the organization keeps me or not." Or words to that effect at that time.

Q. Did he afterwards reveal or disclose the discussion on the contract which was then under consideration with certain employers, to the Employers' Association or to these employers?

MR. BOYLE: Objected to as immaterial.

THE COURT: Do you know anything about it personally?

THE WITNESS: Yes, sir.

THE COURT: Proceed.

To which ruling and action of the court the plaintiffs then and there at the time duly excepted and still except.

A. There was a letter put out to the exhibitors. Every exhibitor got a letter after we discussed the contract. Every exhibitor in the city that we knew of got a letter stating that the operators had concluded to raise their contract and the first of September there would be a new

contract going into effect demanding fifteen cents an hour and fifteen dollars a week for suburban shows, etc. We had discussed the contract the evening before, but we hadn't adopted it. The letter was compared by the organization by a committee. We got a typewriter expert in to compare it, and he declared it had been written by the exhibitor at the Empire Theater. We went to see the exhibitor at the Empire and he was a member of the executive board and he told us he had received this information. That he got the information from Mr. Hughes and put the letter out himself.

Q. Did he afterwards admit he gave the information? A. At the next meeting Mr. Hughes was called in for trial and he said he gave the information.

Q. Were all the defendants present when he confessed this fact? A. Yes, sir.

Q. Has he been ever since that time hostile to the organization? A. He has declared himself so on all occasions in my presence.

Q. What did he say, if anything, in reference to any attempt on his part, or by his association, the Employers' Association of this city, to disrupt and disorganize your association? A. I have heard him state that little nest of operators, their treasury was about defunct and he was going to put them out of business.

Q. Have your organization had anything except the best of feeling up to this time and since this time towards Mr. Hughes? A. They have at all times favored him as a member of the operators, by allowing him to operate his own machine up on last fall when he allowed his dues to become in arrears, and he stated, it didn't make any difference whether he went downstairs and got the money to pay his dues and stay in or not, and after that time he dropped out, and the organization reported he said to Mr. Herring, when the operators called on him, "I am going to put them out of business," and since that time he has not been a member of the organization.

Q. Do you know of your own knowledge he had succeeded on several occasions in getting union operators discharged? A. I do.

Q. And their places taken by non-union men? A. I do.

Q. What places were they? A. He had the Rex Theater and he had the Eastern Theater.

Q. Did he also do that at Seventeenth and Lister while his wife was operating that theater? A. He was operating at that time under the jurisdiction of the local, his own machine, and later on we sent the executive board out and the executive board came back and reported he had a kid in the booth which he was supposed to be operating it by himself.

Q. (By Mr. Boyle.) You are the president? A. I was president last year, I am not this year.

Q. ( By Mr. Aylward.) During the time you were out there, what kind of business did these plaintiffs appear to be doing? A. Well, it was an ordinary picture show business.

Q. I mean in reference to whether the business was normal at the different times you saw it. A. When the picture show was over and the crowd came out, on the three or four occasions I was there, the crowd looked practically the same to me.

Q. That is, they appeared to be doing a reasonably good business all the time? A. The same business all the time I was there. I noticed no difference in the crowd that came out.

Q. And he told you they were doing a good business and that you hadn't interfered with him, I believe? A. Yes, sir, that is what he told me.

Q. That is all.

RE-DIRECT EXAMINATION BY MR. BOYLE.

Q. What is the purpose of picketing? A. The union men of the city are friendly towards their union organizations. We have that means of telling the union men that certain employers are fair to us. The barbers

have their employers that are fair to them, and we patronize only barbers that are fair to the Barbers' Union. By giving information to our friends of other trades and crafts that this certain exhibitor is not employing a union operator and is unfair to us, and therefore our intention is that the other crafts will be informed that this man is not fair to the members of the Operators' Union, and that is addressed to the union men and their sympathizers.

Q. (By Mr. Aylward) : Isn't it also addressed to the public? A. It is to the public.

Q. (By Mr. Boyle) : For what purpose? A. It is for the purpose of informing the union men and their sympathizers and friends that this man is not running a union house.

Q. And to thereby, in so advising them, that they don't patronize that man, isn't that the idea? A. We have no power—there is no rule in any union that I know of to compel a man not to patronize anybody. It is voluntary with him whether he will.

Q. But that is really the purpose?. A. Very few do patronize non-union places.

Q. ( By Mr. Aylward) : You don't attempt to compel them against their will; they can go if they please A. Yes sir. It is information for them.

Q. That is the only method you have of telling your story of your wrongs or supposed wrongs to the general public, whether it is by union men or non-union men? A. It is the only means we have ever found.

Q. (By Mr. Boyle) : Now, what was your real reason then for you picketing this man's place? A. We sent the executive board out to—further back, Mr. Shutler, our operator, was working there. Hughes had gotten the Rex Theater and fired our operator out there, then he came down here and took this theater over and fired the operator there. As attorney for the organization I went to the license department of the city and federal government, and found out there had been no transfer of the licenses, that according to the licenses of the city and

federal governments he didn't own a dollar in it, that he was a strike-breaker, in our estimation. He was a strike breaker trying to put our operators out of business, and I so reported to the organization.

Q. (By THE COURT): Wait a minute. I think you gentlemen are taking up too much time. Your intention in picketing this place was to injure his business, wasn't it? A. To inform the people.

Q. To keep them from going to the place? A. To inform them.

Q. You expected them to remain away after they were informed? A. It is customary for union people not to patronize unfair places.

Q. That is what you wanted them to do? A. We trusted they would.

Q. That is why you put your pickets there? A. The only thing I can say, Your Honor, is that it our intention to inform them it is unfair. We have no doubt that what they won't attend when they know it.

Q. You expect them to govern themselves accordingly? A. I would say that that is the intention, that they govern themselves accordingly.

Q. (By MR. BOYLE): You were picketing the place because he didn't employ union labor, isn't that the fact? A. That was one factor, and the other was because he was employing a man named Brown that was a non-union laborer.

Q. That is the man Brown you have spoken of? A. Yes, sir.

Q. Those were the two reasons: First, because he employed Brown, as you understood him, and also that he didn't employ a union laborer to run his machine? A. Yes, sir.

Q. I will ask you if you saw this article of May 12th in the Labor Herald (showing witness paper)? A. I saw that one evening as I came by the Operators' Club, but I didn't read only just the top of it.

MR. BOYLE: I desire to introduce this newspaper article, which appeared in the issue of the Labor Herald.

This is a paper that is championing labor interests in the city, does it not?

, A.   That is my understanding, but I have never taken it and I have never read it and I don't know.

MR. BOYLE: Bearing upon the effect of the picketing of this man's business is why I introduce the article.

MR. AYLWARD:   I object to the introduction of the newspaper article as being absolutely absurd and ridiculous.   It could not have any probative weight, and being absolutely incompetent, irrelevant and immaterial to the issues here.

THE COURT: Objection sustained.

To which ruling and action of the court the plaintiffs then and there at the time duly excepted and still except.

Said article, so offered and refused admission in evidence, was marked Exhibit 1, and is as follows, to-wit:

### EXHIBIT 1.

"THE LABOR HERALD. ,

"KANSAS CITY, MISSOURI, FRIDAY, MAY 12, 1916.

"JUDGE UPHOLDS PICKETING.

"CENSURS CITY ATTORNEYS FOR HAVING PICKETS FINED.

"After appearing twelve times before Judge Coon, of the North Side Municipal Court, for picketing in front of a moving picture theater, for which on each occasion they were fined the sum of $500, the cases against J. A. Payne and D. L. McCullough, of Moving Picture Operators' Union No. 170, were appealed and they were tried before Judge Latshaw in the Criminal Court last Friday, James P. Aylward, from Frank P. Walsh's office acting as their attorney:

"Judge Latshaw ruled that the right of free speech was constitutional, and as long as force or violence was not used, picketing was permitted by law and substantiated his decision by five opinions from the Court of Appeals in similar cases.   He roundly scored the city attorneys for having the pickets fined and ordered them to appeal to the Court of Appeals if they did not believe his decision was just.

"A number of trade unionists were in the court room during the trial and a representation of the Employers' Association listened to the hot shot which the Judge poured forth in defining what he believed a citizen's right to be under the law.

"Judge Latshaw sustained a demurrer, throwing the cases out of court.

"The pickets are still on the job at Ninth and Lister Avenue, and doing effective work, as the attendance at the unfair movie has dwindled down to about zero."

By Mr. Aylward:

Q. There never was any attempt on the part of your organization, or any member thereof, or the pickets which were assigned to this place out there, to influence any patron or customer of that place, or persons desiring to go in or come out of the same, against their own free will, or by force or coercion, or intimidation or threats of any kind, was there? A. No, sir.

Q. That is all.

Witness excused.

Mrs Daisy D. Brown, called as a witness on the part of the plaintiffs, having been first duly sworn, testified as follows, to-wit:

DIRECT EXAMINATION BY MR. BOYLE.

Q. Please state your name. A. Mrs. Daisy D. Brown.

Q. What are your husband's initials? A. Clarence.

Q. Is he the Brown that was learning the trade at Mr. Hughes's place?

MR. AYLWARD: I object to that.

Q. Was he the man that was learning the business of Mr. Hughes? A. He was learning the business from Mr. Hughes, yes, sir.

Q. Do you know whether he was employed by Mr. Hughes or whether he was paying Mr. Hughes? A. He positively paid Mr. Hughes to learn.

Q. How do you know that? A. Because I paid one five dollars myself, and was present when he paid him the other five dollars.

Q. That is all.

CROSS-EXAMINATION BY MR. AYLWARD.

Q. Where is your husband now? A. He is in Michigan.

Q. How long has he been away? A A month the 2d.

Q. You are friendly to Mr. and Mrs. Hughes and Mr. Briner? A. Well, yes, sir.

Q. That is all.

Witness excused.

Thereupon the plaintiffs rested their case.

Thereupon the defendants, in order to sustain the issues on their part, offered and introduced evidence, oral and documentary, as follows, to-wit:

WILLIAM H. WESTON, called as a witness on the part of the defendants, having been first duly sworn, testified as follows, to-wit:

DIRECT EXAMINATION BY MR. AYLWARD.

Q. What is your name, please? A. William H. Weston.

Q. Where do you live? A. 335 Bellefontaine.

Q. Are you a member of Local 170 of the Motion Picture Machine Operators' Association? A. Yes, sir.

Q. What is your connection with it? A. I am business representative of Local 170 of the Motion Picture Machine Operators.

Q. How long have you been so? A. Four years in August.

Q. Are you acquainted with Mr. Hughes? A. I am.

Q. Do you know Mr. Briner? A. I do not.

Q. Was Mr. Hughes formerly a member of your organization? A. He was.

Q. Have you had during the past six or eight months a conversation with Mr. Hughes with reference to his attitude towards your organization? A. I have.

Q. Just tell the court the nature of those conversations and the statements he made. A. I talked to Mr. Hughes with reference to this man Brown running his machine out there, after he had been suspended from the organization, and I talked to him along the line I would like to get Mr. Hughes to straighten up with the organization, and Mr. Hughes said he bought the show and he could not afford to pay an operator, and I told Mr. Hughes to let his wife run the show and I would give him employment at some other theater; that the attitude he was taking had caused considerable trouble with other exhibitors, and it was unfair for him to run the show himself.

Q. Did you ever threaten Mr. Hughes or Mr. Briner with the destruction of their property or injury to their business? A. I did not.

Q. You heard Mr. Hughes testify to a certain conversation he claimed to have had with you at Thirty-ninth and Main with reference to that matter. Did you have such conversation with him at any time? A. No, sir; I never said anything to Mr. Hughes with reference to destroying his business.

Q. Did you ever attempt to boycott him or threaten him with the boycott or anything like that? A. No, sir.

Q. Have you had occasion to be out in the vicinity of this theater? A. Yes, sir; three or four times.

Q. What was your business in being there? A. I first went there to talk to Mr. Hughes and try to get the place straightened up, to get him to employ a union man and have him come down and settle the proposition with the union.

Q. What did he say about your organization? A. He told me he was out in a neighborhood there where the street car employees were living, and we could go ahead and do what we saw fit; that we could not hurt him; nobody would pay any attention to the pickets if they came out. That was the line of his conversation.

Q. Do you know about the facts concerning his suspension from the organization? A. I do.

Q. Tell the court about that. A. I know all during the month of last August our new contract was proposed or was coming up in the organization, and had been discussed at two or three different meetings of the union, and at one meeting Mr. Hughes was present. I know a day or two follwing that there was a letter sent to the exhibitors all through the city with identically the same scale and everything that we had discussed some two or three days previous to that. I know we traced the letter through an expert here in the city, and traced the letter to Mr.—

Q. (Interrupting): You don't need to state. A. The manager of the Empire Theater.

Q. Did Mr. Hughes afterwards admit he had disclosed the information? A. He did.

Q. What do you know about his attitude towards the organization, with reference to obtaining the discharge of union employees? A. I know he has talked with several managers in the city and tried to have them discharge their employees. I know he displaced two or three different operators during his busniess career as an exhibitor.

Q. At what places? A. He displaced a man at Fifteenth and Spruce, at the Rex, and at Ninth and Lister.

Q. Did you ever threaten to ruin his business? A. I did not.

Q. Did you ever make any statement to him of that kind or character? A. No, sir.

Q. Did you ever tell him he would have to keep away from his business altogether, that he could not run it? A. No, sir.

Q. What was the attitude or demeanor and conduct of the pickets in front of the theater? A. Three or four times I was out there and they were walking up and down in front of the theater. They were walking in opposite directions and talking in a very moderate tone at the outer edge of the sidewalk, and spoke to no one in particular but to the general public.

Q. Did you have to get up close to them to hear them? A. I stood probably a hundred or a hundred and fifty feet from the theater and I could not hear what they were saying.

Q. Did they ever stop? A. At no time that I was there.

Q. Or stand on the sidewalk? A. No, sir.

Q. Or attempt to blockade or obstruct it in any way? A. No, sir, they did not.

Q. Did they ever go by except singly? A. No, sir. Walking in opposite directions.

Q. They never went by two abreast, or anything of that character? A. No, sir.

Q. Did you ever observe any disturbance out there on the part of the pickets? A. Payne and McCullough; no, sir.

Q. How did they conduct themselves? A. Always gentlemanly and in a respectful manner.

Q. Orderly and decent and respectful? A. Yes, sir.

Q. Have you observed Mrs. Hughes at any time? A. I have seen Mrs. Hughes on the sidewalk there.

Q. What has been her attitude and conduct A. I have seen her walk up and down the sidewalk with the pickets.

Q. In what way? A. She would be trailing them up and saying this theater was fair to organized labor.

Q. Did she have her hands or arms around the pickets? A. Not the night I was there.

Q. But you saw her walk up and down? A. I saw her throw tickets in their faces as they passed the ticket box.

Q. You saw her throw tickets in their faces as they passed the ticket box? A. Yes, sir.

Q. Did the pickets say anything to her at these times? A. No, sir; they kept right on going.

Q. Did he address her in any way? A. No, sir.

Q. Or attempt to molest her or interfere with her? A. No, sir.

Q. Were you there the night she put the baby on one of the pickets' shoulders and walked up and down? A. No, sir, I wasn't there.

Q. Has your organization ever instructed these pickets, or any other member, to attempt to ruin the business of these plaintiffs? A. No, sir.

Q. Or threaten or intimidate or coerce any employee or patron or customer of the plaintiffs? A. They have been instructed never to use violence of any kind, and if there was a crowd collected in front of the theater they were picketing, they were instructed to disperse and go on until the crowd left and then come back.

Q. What is your attitude towards employers with reference to them operating motion picture machines themselves? A. We have agreements with each of the Exhibitors' League here that they will employ union operators and they will not operate the machine themselves.

Q. And the employers won't permit it themselves? A. No, they do not.

Q. Did you have complaints from time to time about that? A. Yes, sir.

Q. Claiming their contracts were being violated in that way? A. Yes, sir.

Q. Was the picket ever obstructing the sidewalk? A. No, sir.

Q. Was it open and free? A. Yes, sir; at all times I was there.

Q. People going in and out of the theater? A. Yes, sir.

Q. Has Mr. Hughes made any statement to you with reference to his business? A. I haven't talked to him except at the first night. He said the pickets didn't hurt his business; that the Metropolitan's people lived in the immediate vicinity and were not organized and would not pay any attention to the pickets.

Q. Is this show almost opposite the yards of the Metropolitan? A. Yes, sir.

Q. And in a residence section? A. Yes, sir.

Q.  Was there any attempt on the part of the pickets to interfere with people going in and out of the theater? A.  I have never seen any.

Q.  Or molest them in any way?  A.  No, sir.

Q.  Did you see Mrs. Hughes holding hands with anybody out there, across the sidewalks?  A.  No, sir, I didn't see Mrs. Hughes.

Q.  You did not see that?  A.  No, sir.

Q.  Has your organization entered into any agreement by and between its members to wreck or ruin this man's business, or have you conspired in any way to bring that about?  A.  No, sir, we have not.

Q.  Have you tried to be fair to him and get him to do the right thing?  A.  We have been more than fair with him.

Q.  That is all.

CROSS-EXAMINATION BY MR. BOYLE.

Q.  You say now that the employers, that is, the masters, have come to you and complained because this man Hughes, who was an employer, was running his own machine; is that right?  I just want see if I have you right.  A.  They said he wasn't running his own machine.  He was evading; it was merely a subterfuge to get around employing an operator.

Q.  And these were masters with whom your operators' union had a contract?  A.  Yes, sir.

Q.  That is, your union had a contract now with the individual theater owners, and they were complaining to you about this man Hughes's conduct?  A.  Yes, sir.

Q.  Who were these people and how many of them were they, that this local union of operators, the journeymen operators, were discussing with the theater owners with reference to this man Hughes and his business?  A.  Well, there was two gentlemen—three gentlemen ran a show at Southwest boulevard and Summit.  They let the operator go and one of them began operating the machine at times.  That is, when we were not watching.  He had

a boy in there, and there was a gentleman in Kansas City, Kansas, who did the same thing at the Vendome.

Q. That isn't what I really asked you about. A. I didn't understand the question.

Q. I was trying to find out who it was complained to you people.

Mr. Aylward: I don't think anybody complained in particular, except there was the general complaint about running machines in this way.

Q. I thought the employers and your union had some talk about Mr. Hughes? A. No, sir.

Q. Did these employers of labor come to you at any time and complain about Mr. Hughes? A. No, sir; they simply let their operator go and I asked the reason why, and they said they were going to run the machine themselves if other people were permitted to do it.

Q. So that other theater owners talked with your committee— A. (Interrupting) No, sir; not with the committee.

Q. But with you? A. With me.

Q. As the business manager? A. Yes, sir.

Q. That they were going to do so and so if Mr. Hughes did so and so? A. They did it; they discharged the operator.

Q. Was it by reason of that fact you commenced to picket Mr. Hughes? A. No, sir.

Q. Now, as I understand you, you went out and had a talk with Mr. Hughes—and see if I have this right, because I rather think this important—and you agreed with Mr. Hughes or stated to Mr. Hughes you would be willing to get him a job some place else as an operator if he would employ a union operator in his own place there? A. Yes, sir.

Q. And Mr. Hughes wouldn't do it? A. No, sir, he would not.

Q. And then it was that you commenced this picketing? A. No, sir; it was possibly a year and half after that, anyway a year.

Q.   It was because he didn't employ a union operator that you did picket him, or was that the reason?   A. Well, there are a number of theaters that are not employ- ing union· operators. You understand, the boys are busy working and they can't always get out walking in front of theaters, and it wasn't particularly that reason.

Q.   What was the reason you picketed him?  A. Because the theater was employing a man named Brown, the man who was running the machine there.   That is the reason we went out and said to the public—

Q.   (Interrupting) That is the man Brown that Mr. Hughes spoke of here?   A.   Yes, sir; the man I saw in the booth.

Q.   That was the only reason you picketed him, was that the idea?   A.   He had a man there, as I say, and he was not employing a union man.

Q.   When Brown went, then what did you do?   A. We continued picketing the theater.

Q.   Why?   A.   We wanted the people to know the theater was unfair to organized labor.

Q.   What was he doing that was unfair?   A.   He had this man and I told you he claimed he is a partner. I don't know that he is a partner; merely he is there.

Q.   Who?   A.   Mr. Hughes.   Said he was oper- ating the machine.

Q.   If you had known as a matter of fact that he did own the machine, that he was a partner, then you would not have bothered him; is that the idea?   A.   I could not say.   I don't know positively whether we would have bothered him or not.   We consider any theater unfair to the motion picture operators who do not employ union men.

Q.   Whether they own it or not?   A.   Yes, sir.

Q.   You won't tolerate that, you say?   A.   No, sir. We have been—the privilege has been abused so much .you understand, that the managers will take and hire boys or men and offer them—say they have an interest in the show when they have none.   There is really no interest whatever, because these men have gone out and

worked under the conditions and later on become disgust-·ed and come down to our organization and say, "I had no interest whatever; it was merely a hoax to get by the operators' association."

Q. Just in order to take the matter in your own hands you have adopted the rule that the owner of the machine can't operate it?

MR. AYLWARD: I object to that remark.

Q. You have adopted that rule? A. We are doing it to save our organization.

Q. You have adopted that rule? A. Not alto-gether.

Q. You say "not altogether;" what do you mean by that? A. Well, I don't know. I have never seen a case where a man who was really an owner has operated his own machine and hasn't went around and employed somebody when we were not there, under the pretext of being a partner.

THE COURT: Just a minute. State whether or not it is a violation of the purpose of your organization for a man to operate his own machine? A. We consider it so; yes, sir.

Q. That is all.

RE-DIRECT EXAMINATION BY MR. AYLWARD.

Q. And that is what Mr. Hughes was doing? A. Yes, sir.

Q. And he was a member of your organization and understood the customs and practices? A. Yes, sir.

Q. Why do you object to that? Just tell the court.

THE COURT: He has already testified to that.

Q. That is all.

Witness excused.

J. M. EDMONDS, called as a witness on the part of the defendants, having been first duly sworn, testified as follows, to-wit:

DIRECT EXAMINATION BY MR. AYLWARD.

Q. Please state your name. A. J. M. Edmonds.

Q. Where do you live? A. 3206 East Eleventh street.

Q. What is your business? A. Motion picture machine operator.

Q. What official connection have you with Local No. 170, Motion Picture Machine Operators' Association? A. Simply a member.

Q. Are you acquainted with the plaintiffs in this case, John E. Hughes and Wesley H. Briner? A. I am acquainted with Mr. Hughes.

Q. Have you ever been by that place in the last few months? A. I was there twice when they first started the picketing out there.

Q. How did the pickets conduct themselves? A. Very orderly and peaceable.

Q. And just tell the court how they walked up and down the street. What their attitude was towards the public and patrons. A. Well, they just walked up and down in front of the show. Sometimes one would be behind one another, or other times they would be crisscrossing before it; one man would go one way and one the other.

Q. They never walked two abreast? A. No, sir.

Q. Always singly? A. Yes, sir.

Q. And on the outer edge of the walk? A. Yes, sir.

Q. What was the tone of their voices? A. Just about the same as I am talking now.

Q. Just a mild-mannered tone of voice? A. Just a mild-mannered tone of voice.

Q. Did you ever observe any disturbance of any character? A. Not on the part of the pickets.

Q. Did they ever threaten anybody? A. No, sir.

Q. Or intimidate any person out there? A. Not that I know of.

Q. Did they commit any nuisance that you saw, or obstruct the sidewalks or interfere with any customer or patron of the plaintiffs? A. No, sir.

Q. Was the sidewalk open and free at all the times you were there? A. Yes, sir.

Q. You don't live very far from the theater, do you? A. Yes, sir; I live quite a ways from there.

Q. Did you ever see anybody throw anything at the pickets who were there? A. I seen them on the second night I was there. I seen somebody throw a piece of carbon up over the front of the show. It rolled out across to where a car was standing there.

Q. Were the pickets walking by at the time? A. Yes, sir. At the time the officer yelled up there and told them to stop it.

Q. That is all.

MR. BOYLE: That is all.

Witness excused.

JOSEPH E. WHEELER, called as a witness on the part of the defendants, having been first duly sworn, testified as follows, to-wit:

DIRECT EXAMINATION BY MR. AYLWARD.

Q. What is your name, please? A. Joseph E. Wheeler.

Q. Where do you live? A. 717 Lister.

Q. You are not a member of the Motion Picture Machine Operators' Association? A. No, sir.

Q. But you are a member of some other craft? A. Yes, sir.

Q. Did you live in the neighborhood of this motion picture show? A. Yes, sir.

Q. How far away did you live? A. A block and three doors north.

Q. Do you know the plaintiff Mr. Hughes? A. Yes, sir.

Q. Have you observed the pickets in front of the theater? A. Yes, sir.

Q. Just tell the court what their conduct has been? A. It has been orderly.

Q. How many times have you had occasion to be there? A. About every night.

Q. Did you ever see them blockade the sidewalk? A. No, sir.

Q. Or interfere with any customer or patron of these plaintiffs? A. No, sir.

Q. Just describe or tell the court the character or tone of their voice. A. Why, it was moderate.

THE COURT: What did they say? A. "This theater is unfair to organized labor; please do not patronize it."

Q. Is that all that was said? A. Yes, sir.

Q. They said that in a low tone of voice? A. Yes, sir.

Q. (By THE COURT): They said that to everybody that came to the theater? A. Said that to everybody that came by.

Q. It made no difference whether they were going to the theater or not? A. They made that remark.

Q. (By MR. AYLWARD): They never passed two abreast? A. No, sir.

Q. Always singly? A. Yes, sir.

Q. They never used any vile or profane language? A. No, sir.

Q. Have you observed the conduct of Mr. Hughes and his wife? A. Yes, sir.

Q. Tell the court what that has been.

THE COURT: I don't care anything about that.

MR. AYLWARD: This is a proceeding in equity and these people have to do equity before they can claim equity.

The COURT: I don't care anything about that.

Q. That is all.

### CROSS-EXAMINATION BY MR. BOYLE.

Q. What were you doing there every night? A. I would walk up to the corner every night.

Q. You didn't go to the theater? A. No, sir.

Q. Because you were a union man? A. Yes, sir.

Q. Then you didn't patronize the theater? A. No, sir.

Q. Because it was being picketed? A. Yes, sir.

Q. That was the idea? A. Yes, sir.

Q.   That is all.
Witness excused.

Thereupon it is agreed that all the members of the
executive committee, Frank Cessna, Harry Randall, J.
L. Herring and D. A. McCullough, would testify denying
any statement to the effect that they at any time stated
to the plaintiff Hughes that they were going to get him
or wreck, ruin or injure his business.

Thereupon the defendants rested and this was all
the evidence introduced.